**STATE of Missouri, Respondent,**

v.

**Mark E. SAGER, Appellant.**

**No. KCD 30389.**

Missouri Court of Appeals,
Western District.

May 5, 1980.

Motion for Rehearing and/or Transfer to
Supreme Court Denied June 9, 1980.

Application to Transfer Denied
July 15, 1980.

Roy W. Brown and James R. Brown of Brown & Brown, Kansas City, for appellant.

John Ashcroft, Atty. Gen., Jefferson City, Earl W. Brown, III, Asst. Atty. Gen., Kansas City, for respondent.

Before TURNAGE, P. J., and SHANGLER and MANFORD, JJ.

MANFORD, Judge.

This is a direct appeal from a jury conviction for manslaughter. The trial court affixed punishment at ten years in the Missouri Department of Corrections. The judgment is affirmed.

On this appeal, the court is faced with five alleged points of error, which in summary are as follows: (1) the trial court erred as a matter of law in overruling ap-

pellant's motion to suppress evidence of an alleged oral statement of October 1, 1977 and further, in permitting appellant to be cross-examined about alleged oral statements of October 2 and October 5, 1977, and the further use of said statements, because all of said statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); (2) the trial court erred as a matter of law by allowing opinion evidence as to who placed a bite mark upon the body of the deceased because [a] bite mark identification has not reached the point of scientific reliability and credibility to permit the use thereof as evidence in criminal trials, [b] the state's witnesses were not sufficiently qualified as experts in the field to permit of their rendering an opinion as to the identity of the perpetrator of the bite mark and [c] the factual basis for such opinion was not supported by reliable and credible evidence; (3) the trial court erred as a matter of law in giving instruction No. 8 (MAI–CR 15.18—Manslaughter) because this instruction failed to inform the jury with the particular time of death (3:30–5:00 p. m.), allowing the jury to find appellant guilty without proof of the death of the victim during the time specified; (4) the trial court erred as a matter of law in giving instruction No. 8 (MAI–CR 15.18—Manslaughter) because there was no evidence to support said instruction, and the credible evidence fails to support a finding of guilty for manslaughter, and the court erred in not granting appellant's motion for acquittal notwithstanding the verdict; and as his final alleged error (5) appellant contends the trial court erred as a matter of law in denying him a new trial for the reason that the cumulative and prejudicial denial of due process resulted from the deliberate failure of the prosecutor to timely fully disclose the evidence ordered disclosed by the trial court and other complaints more fully set out in appellant's motion for new trial contrary to

the *Mo.Const.* Art. I, §§ 10, 12, 14, 15, 16, 17, 18(a), 19, 20 and 21 and the U.S.Const. Amends. IV, V, VI, VII and XIV.

At approximately 3:20 p. m. on September 2, 1977, 14 year-old Julie Wittmeyer got off the Platte RIII school bus. The bus had stopped at its regular stop on HH Highway, which was at the entrance to the roadway leading to the Wittmeyer farm. A passing motorist observed Julie leave the school bus and proceed to her family's mailbox. Between 5:30 and 6:00 p.m. on this same date, Julie's father called the bus driver, only to learn Julie had gotten off the bus earlier in the day.

The father, accompanied by his son, commenced to search for Julie. As the two had covered a distance "pretty well down" the 3,161 foot driveway, the son discovered personal items belonging to Julie. These items consisted of a pair of brown shoes, part of a brown shirt, a pair of tan slacks, a blue notebook and an algebra book. These items were in an asparagus patch adjacent to the driveway, and within an area approximately 4 feet by 8 feet consisting of vegetation. This area of vegetation was matted down, indicating signs of a struggle.

The Platte County Sheriff was then contacted, and an intensive search commenced, which continued until about 1:30 a. m. the following morning. Rain temporarily interrupted the search. On the afternoon of September 3, 1977, part of a blouse and a bra were found and an evidence technician was sent to the scene to photograph these items. The search continued, involving some 200 to 300 persons, both law enforcement officials and volunteers. On September 4, 1977, a local citizen was searching the area on horseback and discovered a body. Law enforcement officials were notified, and the body was identified as that of Julie Wittmeyer. The following are scaled drawings, depicting the area, the location of personal effects and the body of the victim.[1]

---

1. Taken from state's exhibits nos. 2 & 3. It was developed that these exhibits and defense exhibits nos. 2 & 3 were comparable.

STATE v.
MARK E. SAGER
No. 30,389

A-WITTMEYER HOME
B-SAGER HOME
1-BOOKS & PART of CLOTHES
2-BRA & PART of SHIRT
3-LOCATION BODY FOUND

I-29

INTERURBAN RD.

③

SHARP'S STATION

PLATTE RIVER

RTE. "HH"

RTE. "B"

Ⓑ

FARMERS LANE

INTERURBAN RD.

HOOVER

RTE. "HH"

① ①
②
①
Ⓐ

BETHEL RD.

PLATTE CITY

M-92

RTE. "O"

WITTMEYER HOME

A- {1 PR. BROWN SHOES, PART OF BLUE & BROWN SHIRT, 1 PR. TAN SLACKS (WOMAN'S) 1 PURSE, 1 BLUE NOTEBOOK, 1 ALGEBRA BOOK

B- {PART OF BLUE & BROWN SHIRT 1 BRA

3161 FT. TOTAL RTE. "HH" TO FARM HOME

ASPARAGUS FIELD

TOBACCO FIELD

JULIE WITTMEYER
SEPT. 2, 1977
PLATTE COUNTY MO.

GATE — 54 FT (RTE "HH" TO GATE)

RTE. "HH"

---

At about 1:30 p. m. on September 4, 1977, an autopsy was performed. The autopsy revealed a three-centimeter [2] abraded laceration to the forehead. This wound was described as being compatible with a blunt traumatic blow to the forehead. There was a one-centimeter laceration along the vermillion border of the upper lip, with teeth marks on the opposing side interiorly. The autopsy also revealed multiple lacerations, both superficial and penetrating and both external and internal to the neck and throat; multiple lacerations to the super clavicular; laceration to the mandibular angle extending laterally to a point just below the left ear lobe; laceration to the neck

2. 2.5 centimeters = 1 inch.

with penetration extending to the vertebral column; laceration to the left shoulder region; a bruise overlying the mid portion of the sternum; an abrasion to the superior edge of the areola of the right breast, consisting of two slightly arched segments, suggesting teeth marks; (the right nipple and right areola were abraded with the superficial layer of skin missing with white discoloration of the underlying skin) an abrasion between the right labia minora and majora; a cruciate abrasion external to the mons pubis; an abrasion (posteriorly) from the inferior aspect of the entroitus; a laceration (penetrating) to the fornix of the vagina at about 4 to 5 o'clock from the cervix at the distal end of the vagina; an abraded wound immediately beyond the entroitus; and a penetrating wound in the vagina extending into the massive muscle overlying the vertebral column which had penetrated the terminal portion of the ilium. The autopsy further revealed the presence of tree bark in the peritoneum and a penetrating wound inside the throat, which transected the esophagus and thyroid.

The pathologist who performed the autopsy listed the cause of death as exsanguination [3] resulting from the multiple wounds inflicted upon the victim. Exsanguination was listed as the death cause because of the lack of blood in the internal organs and the amount of blood retained in the vaginal cavity.

Tests were made to determine whether or not sexual intercourse had occurred. Tests for semen and phosphates proved futile due to the fact that the vaginal cavity was awash with blood.

The time of death was listed between 24 to no more than 72 hours preceding the autopsy. The pathologist testified that there were so many variables that a more definite time could not be affixed. He also testified that he was aware of the time frame regarding the time that the victim was last seen and the time the body was discovered. In his opinion, due to the multiplicity and severity of the wounds, the victim could not have lived more than a few minutes following the attack. He also stated that it was difficult to tell if any particular wounds had been inflicted antemortem or postmortem, but added that the wounds in the internal vaginal area were most likely inflicted postmortem. This conclusion was based upon the absence of blood inside the wounded area.

At the request of local law enforcement officials, the Metro Squad was activated. This special law enforcement agency is a cooperative effort, which is bistate, (Missouri-Kansas), multicounty and multimunicipal in nature. It combines the efforts of law enforcement agencies of several local police departments, the Missouri Highway Patrol, several sheriffs and on occasion, the F.B.I. and other federal agencies. The Metro Squad program is assisted by the Regional Crime Lab. It is activated upon the request of any participating local law enforcement agency and assists with the investigation of area major crimes. In the instant case, the Metro Squad became involved at the request of Tom Thomas, Sheriff of Platte County, on September 3, 1977. Marion Beeler, Chief of Police of the City of Raytown (Jackson County), Missouri was designated to head the investigation.

Several teams of investigators, along with evidence and laboratory personnel from the Regional Crime Lab, were pressed into service. After discovering the victim, the Metro Squad continued its investigation, interviewing several persons and pursuing several leads. Though none of the officers could point to one particular piece of information which led to appellant as a suspect, Missouri Highway Patrolman William Bell described the process of putting all reports and all interviews together to get a total picture, and from that picture, deriving indications that appellant was involved in the matter.

After appellant's name had come to the Metro Squad's attention, (at least two witnesses described appellant's car as having been seen on the Interurban Road and HH Highway, a fellow student stated that ap-

3. Literally defined as death caused by bleeding.

pellant had talked to her about Julie Wittmeyer and an assistant to appellant's personal dentist stated appellant told her he was the last person to see Julie Wittmeyer alive) a Trooper of the Missouri Highway Patrol, a Detective McLendon of the North Kansas City Police Department and a Platte County Deputy Sheriff went to interview appellant at Menorah Medical Center. The date of this interview was September 12, 1977, and the officers met with appellant and his mother. No *Miranda* warnings were given as appellant was only advised that his name had come up in the investigation and that his car had been seen in the locations where the crime had occurred.

Appellant related to the officers what had taken place on September 2, 1977. He stated he left school at 12:15 p. m., and had his mother drive him home to get his car. He got his car and went to work. He stated he left work at 3:30 p. m. and got home at 4:00 p. m. At 4:30 p. m., he helped his friends put a radio in their car at his house, and at 5:00 p. m., his parents arrived home. When they arrived, he left with them to go to Menorah Hospital.

On September 15, 1977, Officer McLendon returned to Menorah Hospital to talk with appellant. The purpose of this visit was twofold. First, the officer was attempting to clear up discrepancies in appellant's statement of events of September 2, 1977. The second purpose was to request permission to secure impressions of appellant's teeth.

Persons present at the September 15, 1977 meeting, in addition to appellant and Officer McLendon, included appellant's mother, Steven Carrol, (special prosecutor for the Platte County Prosecutor) and a nurse. *Miranda* warnings were read to appellant and a waiver regarding the presence of legal counsel was signed. It was explained to appellant that he had become a suspect in the matter and tooth impressions would either clear him or further implicate him.

On September 16, 1977, tooth impressions of appellant were taken. *Miranda* warnings were again given. Appellant declined the presence of legal counsel and signed a waiver of rights. Present at this meeting were appellant's mother, a nurse, Dr. Ira Gladfelter and Officer McLendon. Appellant's mother stated that they could proceed with the taking of the impressions. The tooth impressions or casts taken on this date were taken to Hartford, Connecticut, by Sheriff Thomas. The Sheriff met with Dr. Lester Luntz in Hartford. The first casts indicated that appellant was involved, however, there was a slight flaw present in the casting.

On September 30, 1977, Detective Clarence Luther of the Kansas City Missouri Police Department, Corporal Fred Mills of the Missouri Highway Patrol, Sergeant Herb Soule of the Sugar Creek Police Department and Sergeant Merle Rice of the Regional Crime Lab met with appellant, appellant's parents and Dr. Jon Finley at Menorah Hospital. Appellant was advised he was now a prime suspect in the murder of Julie Wittmeyer. No *Miranda* warnings were given as no interrogation ensued.

A waiver granting permission for additional tooth impressions was signed by appellant and both of his parents. Dr. Finley took tooth impressions and the process was photographed by Sergeant Rice. These impressions were again taken to Hartford, Connecticut by Sheriff Thomas. The casts were analyzed by Dr. Luntz. Sheriff Thomas talked long distance with Chief Beeler and Lee Hull, Platte County Prosecutor, on October 1, 1977. When Sheriff Thomas relayed Dr. Luntz's conclusion that the casts matched the bitemarks, the decision was made to arrest appellant.

At 2:00 p. m. on October 1, 1977, Detective Luther, Corporal Mills and Sergeant Soule went to appellant's residence to arrest appellant. Upon their arrival, they were advised that appellant, his father and brother were out getting a haircut. Shortly later, they arrived home. At that time, appellant and his parents were advised that appellant was being placed under arrest for the death of Julie Wittmeyer. Corporal Mills read appellant the *Miranda* warning.

Prior to appellant's departure with Officers Luther and Mills, appellant's mother told appellant not to sign anything or to admit anything. Appellant was transported to the Platte County Court House Annex. Officers Luther and Mills then interviewed appellant. Officer Luther advised appellant of his *Miranda* rights and specifically advised him that he had right to counsel. Appellant stated he did not have an attorney and that he did not want an attorney. Appellant stated that he would be willing to talk with the officers, but under his mother's instructions, would not admit anything or sign anything.

During this interview, the officers explained to appellant about his being a prime suspect, and also explained the type of physical evidence which they had against him. The discussion about the physical evidence came about in response to appellant's concern and reference to physical evidence. Detective Luther discussed the bite mark and told appellant that the specialists had concluded that appellant's teeth had caused the bite mark found on the victim's body. Appellant, at this point, asked, "So you can prove that I bit her on the breast, but what does that prove?" Detective Luther explained that at no time to any person had the location of the bite been disclosed or discussed. Detective Luther then explained to appellant that it proved that he either bit the victim before or after her death.

Appellant then related his activities of September 2, 1977. He stated he left school at 11:55 a. m., that his mother arrived at school to take him to work and that they argued because he insisted on being taken home to get his own car. The mother drove him home and appellant jump-started his own car and got to his job at the Riverside Drive In at 1:15 to 1:20 p. m. He stated he left work at 3:00 to 4:00 p. m. and got home around 4:00 p. m. He recalled the time of arrival because his brother and sister were watching Gilligan's Island on television.

Appellant denied ever having known Julie Wittmeyer. Finally, the officers asked why wouldn't he tell them how Julie was killed. To this, appellant stated, "If my daddy will let me tell you, I will tell you everything how she was killed and everything." This interview was concluded somewhere between 4:00 and 6:00 p. m. the evening of October 1, 1977.

At about 6:40 the same evening, Sheriff's Deputy Terry Deister and Corporal Bell of the Highway Patrol again interviewed appellant. Deputy Deister asked appellant if he wished to be readvised of his *Miranda* rights, and appellant said no. Appellant again recounted his activities of September 2, 1977. At approximately 7:30 p. m., this interview was interrupted by the appearance of appellant's attorney. A private conference between appellant, appellant's father and the defense counsel occurred and following this private conference, the defense counsel instructed Corporal Bell not to talk with his client anymore.

Corporal Bell relayed counsel's message to Chief Beeler. On the same day, counsel had talked with Chief Beeler, advising him he was counsel for appellant and that a letter would be forthcoming confirming his representation of appellant. A letter was received on October 5, 1977 or October 6, 1977.

On October 2, 1977, at about 11:26 a. m., appellant was, for security reasons, transferred from the Platte County Jail to the Lafayette County Jail. He was accompanied by Deputy Deister and Corporal Dayringer of the Missouri Highway Patrol. As entry was being made into the patrol car, Deputy Deister read the *Miranda* warning to appellant. Appellant indicated that he understood the warning. During the trip, appellant, at first, did not want to talk about the case, but as the trip proceeded, appellant stated he wanted to continue his statement from the night before. While the *Miranda* warnings were not specifically reread to appellant, he was advised anything he said would be used against him and an explanation of the results of his statement were explained.

During this trip, appellant continued his statement, explaining that he left the drive-in at 3:45 p. m., that he arrived at his home at 4:15 p. m., while there were cartoons on

television, that he called the drive-in trying to contact his parents but got a busy signal, slammed the phone receiver down so hard that he broke the phone, and then tried to repair the phone. Appellant stated that he did not know Julie Wittmeyer. Both officers transporting appellant on October 2, 1977 denied knowing appellant had an attorney.

On October 3, 1977, appellant was transported back to Platte City for arraignment. Although *Miranda* warnings were read, no statements were made by appellant. Appellant was returned to Lafayette County after arraignment.

On October 5, 1977, Detective Luther and Corporal Mills interviewed appellant at the Lafayette County Sheriff's office for 1½ to 2 hours. Officer Luther thought Chief Beeler had assigned him and Mills to interview appellant, but Chief Beeler stated he was not sure that he had made such an assignment. Officer Luther had been present at the arraignment on October 3, 1977, but did not know that the young man with appellant at the arraignment was to be appellant's attorney. Officer Mills was unaware of any attorney being present at appellant's arraignment. At this interview (October 5, 1977), *Miranda warnings were given and appellant signed a written waiver.* Appellant agreed to talk with the officers, but his parents had told him not to admit to anything. Appellant stated he was not sure if his parents had retained an attorney, that possibly they were going to get Attorney Brown, but that he did not know if they were going to keep him as their attorney. Appellant agreed to talk with the officers without an attorney.

The purpose of the October 5, 1977 meeting was to try to find out "why he killed Julie" and to see if the officers could secure any incriminating statements or confessions from appellant. As the interview continued, it centered upon physical evidence which incriminated appellant. After discussing the bite mark, the officers began talking about going to appellant's home to look for a knife. At this point in the interview, appellant started laughing and said,

"You didn't find it, did you?" Then the following conversation took place:

OFFICER LUTHER: "Mark, how can you be so sure we didn't find the knife?"

SAGER: "I know because if you tell me you found the knife used to kill her that you're lying to me because I know you didn't find the knife."

The conversation continued, and appellant was told that three knives had been found. Appellant advised the officers that they were wasting their time because they did not have the right knife. The following questions and answers then developed:

LUTHER: "Mark, what did you do with the knife? Did you throw it in the Platte River?"

SAGER: "Let's just say I know you're not going to find the knife."

The discussion then turned to appellant's relationship with his mother, and one occasion when he had choked her. Appellant stated that he knew that was wrong, but that he had just put it out of his mind. Appellant further stated it was possible to do that with the murder of a little girl, saying, "Don't you think it's possible . . . what if a doctor would tell you that I could do something like this and just put it out of my mind, that I would forget it, that I did something like this?" Later, appellant asked, "What if my teeth were off a certain millimeter or something like that, would they still say it was me?" Then, appellant asked if the officers could try to get him into the state hospital rather than prison because inmates wouldn't like anyone that killed a young girl. Appellant stated, "I am sure they'll convict me if I go to trial and I would just as soon go on to the state hospital now."

On October 25, 1977, by indictment, appellant was charged with capital murder and on the same date, appellant entered his plea of not guilty. Request for discovery was made, and trial was set for January 23, 1978 by Judge Yeaman of the Platte County Circuit Court.

The discovery process, pretrial motions and depositions followed. On January 13,

1978, a motion for change of venue was sustained and the cause was transferred to Boone County. Appellant was ordered by the court to undergo mental examination at the state hospital in Fulton, Missouri. On January 24, 1978, appellant was certified competent to stand trial.

On March 2, 1978, appellant filed an extensive motion to suppress, accompanied by a motion to dismiss. The motion to suppress sought suppression of the tooth impressions and statements of October 1, 2 and 5, 1977. Suppression of the tooth impressions was premised upon the fact that the impressions were illegally obtained and that such evidence was not scientifically reliable. Suppression of the statements was sought upon the premise that they were obtained in violation of appellant's rights under *Miranda v. Arizona, supra,* and after defense counsel had specifically instructed that all interrogation cease.

On March 9, 1978, a hearing was held on the motion to suppress. The court denied the motion as it related to the tooth impressions. Ruling upon the motion as it related to the statements of the 1st, 2nd and 5th of October, 1977 was deferred for ruling to a later time.

On May 2, 1978, appellant filed a motion to disqualify Judge Yeaman. This motion was sustained on May 5, 1978, and Judge Conley of Boone County was given jurisdiction to hear the case. Trial was set for May 23, 1978. On May 22, 1978, Judge Conley overruled the motion to suppress as that motion related to the statement of October 1, 1977, sustained the motion to suppress as it related to the statement of October 5, 1977 as to the use of this statement in the state's case in chief, and deferred ruling upon the motion as that motion related to the statement of October 2, 1977. The court ultimately sustained the motion to suppress as the motion related to the statement of October 2, 1977 as to the use of this statement in the state's case in chief.

After jury selection, trial commenced and lasted some eight days. On June 1, 1978, the jury found appellant guilty of man-slaughter. The jury could not agree upon punishment. After the verdict, motions for acquittal notwithstanding the verdict and for bail were filed. The motion for judgment N.O.V. was overruled and bond was set at $100,000. A motion for judgment of acquittal or in the alternative for a new trial was filed. These motions were overruled and punishment of 10 years in the Missouri Department of Corrections was assessed. This appeal followed.

Appellant's initial alleged error asserts that the trial court erred as a matter of law and as an abuse of discretion by overruling appellant's motion to suppress evidence of an oral statement given by appellant on October 1, 1977 and by permitting the state to cross-examine appellant about oral statements of October 2, 1977 and October 5, 1977, and the use of the latter statements in rebuttal. It is alleged the court's action violates the Constitutional safeguards protected under the rule enunciated in *Miranda v. Arizona, supra.*

Appellant was arrested at his home on October 1, 1977. At the time of his arrest, he was a high school senior. He was arrested in the presence of his parents. The arresting officer was Clarence Luther, a detective of the Kansas City Missouri Police Department, who testified that he arrived at appellant's home in the presence of other officers. The officers were admitted to the home by appellant's sister, who advised the officers that appellant was at the barber shop with his father. Within minutes, appellant, with his father, returned home. The officers advised appellant and his parents that they had physical evidence connecting appellant with the death of Julie Wittmeyer.[4] The officers informed the appellant and his parents of a particular bite mark found on the body of the victim, but the location of the bite mark was not disclosed.

Appellant's mother showed concern over the physical evidence that the officers had, and she asked permission to talk with appellant for a moment before he was trans-

4. As the record reveals, dental impressions of appellant's dentition preceded his arrest.

ported to jail. In the doorway to appellant's residence, his mother instructed him not to admit anything or to sign any papers.

Appellant was transported to Platte City. Upon arrival, he was advised of his rights under *Miranda v. Arizona, supra.* He was presented with a form no. 340, which included the *Miranda* warning and a place to affix his signature as a waiver. The officers testified that in addition to giving the *Miranda* warning verbally, and the offer of the form no. 340, they discussed with appellant the fact of whether or not he understood his rights under the *Miranda* warning and whether or not he would be willing to discuss the matter without an attorney. According to the officers' testimony, appellant agreed to talk with the officers, but told them he would neither admit to anything nor sign anything because his mother had so instructed him.

On this same date (October 1, 1977), the officers testified, they continued to talk with appellant, and advised him that he was a prime suspect in the matter of Julie Wittmeyer's death. The officers testified appellant was advised of the bite mark on the victim's body, but the location was not disclosed, and further, that specialists had identified appellant as the party who had placed the bite marks on the victim's body.

The discussion continued, and included reference to identification by bite mark. At this time, the officers claim appellant made the following remark, "So you can prove that I bit her on the breast but what does that prove?" It was the testimony of the officers that the location of the bite had not been disclosed to anyone, including the appellant. The officers testified appellant stated he would admit he did bite the girl, but then added, "What does that prove?"

The officers then stated the discussion centered upon appellant's account of his activities on the day of September 1, 1977. Appellant stated he attended school in the morning and left school about 11:55 a. m. because he had an afternoon job at the Riverside Drive-In Theatre. Appellant advised the officers that he had made arrangements with his mother for her to pick him up from school. When the mother was not at the school at 11:55 a. m., he called her to come and pick him up. Appellant stated he was picked up by his mother and then got into a fight over his wanting to drive his own car to work. After this argument, his mother agreed to drive him home where he jump-started his car and reported to work. He arrived at work at approximately 1:15 to 1:20 p. m. and proceeded to mow the grass on the lawn of the drive-in. During this time, he had received a message about a phone call. He called his girl friend, who advised him that his mother had called, asking her (the girl friend) how to contact appellant as his parents were going to pick him up and take him to the hospital. At this, appellant became angry, as instead of going to the hospital, he wanted to go to a football game that evening. Appellant told the officers that a fellow employee jump-started his car and that he drove, at 70 m. p. h., home.

When asked about his departure time from the drive-in, appellant told the officers it was 3:30, then 3:45 p. m., then since he did not have a watch, it was between 3:00 p. m. and 4:00 p. m.

Appellant then stated he arrived at home between 4:05 and 4:10 p. m. He knew this to be the correct time because "Gilligan's Island" [5] was on the T.V., which his younger brother and sister were watching at the time.

According to the officers' testimony, appellant denied even knowing the victim, but that approximately four years prior to her death, he had gone to the Wittmeyer farm with his parents to buy peaches.

Appellant showed a great concern over physical evidence and expressed a desire to see the dental charts. Further discussion centered upon the victim's death. At this point, appellant asked, "What if my doctor

5. Testimony of a witness for Channel 41 testified that on September 1, 1977, the program Gilligan's Island started at 4:27 p. m.

says I didn't know what I was doing?" This question was followed by assurances from appellant that he had a good memory. The discussion continued further, when one of the officers asked appellant, "Mark, what's keeping you from going on and telling us all about how you killed Julie Wittmeyer and how she was killed?" After a long pause, appellant held his head down and stated, "If my daddy will let me tell you, I will tell you everything how she was killed and everything." Officer Luther testified that it became obvious nothing further was going to be discussed, so he terminated that particular interview or discussion.

On cross-examination, Officer Luther testified that the interview had lasted about one hour to an hour and a half. He further stated that prior to the interview, the *Miranda* warning had been given appellant, that appellant verbally acknowledged he was aware of his rights, that the written waiver was tendered to appellant, but that under instructions from his mother, he refused to sign the waiver. Upon further cross-examination, Officer Luther stated he kept notes of the interview, and these were later transcribed into his formal report. The evidence also shows that no written summary of the interview was presented to appellant, although the report or a copy of same was provided appellant's counsel under discovery.

Cross-examination revealed that appellant had been arrested, transported to Platte City, and advised of his rights under the *Miranda* warning. Appellant agreed to talk with the officers, but under instructions from his mother, he would not admit or sign anything.

Cross-examination further revealed that appellant asked the officers, "What if my teeth are one millimeter off, would you still say they matched?" The officers responded that an expert had stated appellant "was the one who put the bite marks on Julie."

In continued cross-examination, appellant inquired of the officers as to why there was no mud on his shoes or dirt or dust over his car. The officers reportedly answered appellant by telling him that as far as they knew, there could be dirt, dust and mud on his car and shoes. Appellant denied ever having been on Interurban Road. The arresting officer was asked if appellant's mother had not shown the officer a copy of a telephone bill at the time of appellant's arrest, and the officer answered yes. The arresting officer denied knowing that the defense counsel had even been contacted for appellant, and stated he became aware of an attorney's entry some seven or eight days following the interview of October 1, 1977. The arresting officer did testify, however, that he had learned there was an attorney present with appellant at the arraignment on October 3, 1977, two days after the initial interview.

The foregoing testimony surrounding the arrest and initial interview of appellant was further supported by the testimony of other officers present during the arrest and the interview.

█ The evidence on this record clearly establishes that appellant was afforded the *Miranda* warning; that appellant was under no mental or educational handicap which prevented his voluntary waiver to remain silent, to be afforded counsel, to know any incriminating statement could be used against him and that he could have terminated the interview at anytime. The evidence is quite to the contrary and reflects no compulsion and no incommunicado interrogation in a police dominated surrounding without full warnings of constitutional rights as mandated by *Miranda v. Arizona, supra.*

It should be pointed out that appellant's motion to suppress the oral statements of October 1, October 2 and October 5 were vigorously and continuously pursued by his counsel. A full hearing comprising many pages of transcript touched upon this issue and the renewal of the motion was vigorously and continuously made by defense counsel throughout the trial.

The trial court correctly concluded that the oral statement of October 1, 1977 could be admissible, in the state's case in chief as

the safeguards of *Miranda v. Arizona, supra*, were provided and appellant knowingly and voluntarily waived those rights.

While the law does not require the securing of an express waiver of rights from an accused, see *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), the record herein reflects this appellant was provided the *Miranda* warning, knew what his rights were and knowingly and voluntarily agreed to discuss the matter with the officers, reserving only the right not to admit anything or to sign anything because he had been so instructed by his mother.

That portion of appellant's first point of error, relating to the oral statements of October 1, 1977, for the reasons set forth above, are ruled against appellant.

Appellant was transported to the county jail in Lafayette County for security reasons. The oral statements attacked by appellant on his appeal under the dates of October 2, 1977 and October 5, 1977, as the evidence reveals, centered upon the moving or transporting of appellant to and from Platte County to Lafayette County, and during appellant's confinement in the Lafayette County Jail.

On October 2, 1977, appellant was transported from Platte County to Lafayette County in the company of two law enforcement officers. These officers were Deputy Deister and Trooper Dayringer. Deister testified that before entering the patrol car for the trip, he read the *Miranda* warning to appellant and in turn, appellant acknowledged that he understood his rights. It was the testimony of Deister and Dayringer that appellant expressed a desire to discuss the instant case during this trip and that he began asking questions. These officers also testified that appellant expressed a desire to finish his statement made the previous day. Appellant had not been arraigned at the time of this trip. Both officers testified at the hearing upon appellant's motion to suppress, and the following is a recount of the evidence secured from these officers upon this issue.

Deputy Deister testified that before entering the patrol car, he informed appellant of his rights and appellant acknowledged he understood his rights. As the trip first started, appellant indicated he did not want to talk to the officers. The trip continued, and Deputy Deister explained to appellant that the trip to Lafayette County was for security purposes. The discussion then enlarged with details of appellant's arraignment scheduled for the following day, and appellant's being advised the officers would return appellant to Platte County for arraignment. At this point, appellant began to ask questions about the instant case.

During the hearing, Deputy Deister was asked if he knew at the time of the trip whether appellant was represented by counsel. He answered by stating he had seen defense counsel at the Platte County Jail the evening before, but did not engage counsel in conversation. He further testified that appellant told him during the trip that he had an attorney, but that appellant never indicated he desired the presence of counsel prior to visiting with him and the Trooper. Deputy Deister also stated that he had, at this point, not received any order or instruction not to talk with appellant because appellant was represented by counsel.

Upon cross-examination during the hearing on the motion to suppress, it was learned that Deputy Deister had talked with appellant the evening of October 1, 1977 in Platte County. The deputy placed the time at about 6:40 p. m., and prior to his having seen defense counsel in Platte County. It was also determined that appellant had signed a waiver of his rights under *Miranda v. Arizona, supra*, the evening of October 1, 1977.

According to Deputy Deister's testimony, as the trip to Lafayette County progressed, appellant began talking to the officers in the patrol car. This discussion ensued some 30 minutes after appellant was given the oral *Miranda* warning when he entered the patrol car. The Deputy recounted appellant's statements to him, and the following is the substance of those statements. The

appellant, according to the Deputy's testimony, stated he left his job around 3:45 p. m. and described his route home. He advised the Deputy he arrived home about 4:15 p. m. Appellant then stated he attempted to call the Riverside Drive-In to contact his parents, because his parents had proceeded to the drive-in to pick him up. When he got a busy signal on the phone, he slammed down the telephone receiver so hard that he broke the phone. The discussion then included the fact that appellant called his girl friend to tell her he was at home. Appellant then corrected the sequence of phone calls, stating he called his girl friend first. The amount of gasoline in appellant's car was discussed, and the Deputy testified that during his conversation with appellant the evening of October 1, 1977, appellant stated his gas tank was full, but during the conversation of October 2, 1977, appellant remarked the tank was only one-quarter full.

As the discussion proceeded, appellant denied ever knowing the victim. He further stated he carried a three-bladed pocket knife, but when he entered the hospital, his mother had taken it from him and had not returned it. When asked about his ever having been on the Interurban road, appellant told this deputy he had been on it only on two occasions.

The sequence of events pertinent to appellant's first point of error now shifts to the events of October 5, 1977. The evidence reveals that on October 5, 1977, Officer Luther of the Kansas City Missouri Police Department and Trooper Fred Mills of the Missouri Highway Patrol interviewed appellant in the Lafayette County Jail. Officer Luther testified (in rebuttal) that appellant was informed of his *Miranda* rights. At this October 5, 1977 meeting, *appellant signed a waiver of rights form*. Officer Luther advised appellant of the bite mark evidence, and the conversation moved to the point of the authorities making a search for a large buck knife. According to Officer Luther, at this point appellant "just changed his whole personality and he hit his hand on the desk, slapped his legs and said, 'You didn't find it, did you?'" Following

this remark, Officer Luther testified he asked appellant, "Mark, how can you be so sure we didn't find the knife?" to which appellant was reported to have said, "I know because if you tell me you found the knife used to kill her that you're lying to me because I know you didn't find the knife." Officer Luther then asked appellant, "Mark, what did you do with the knife? Did you throw it in the Platte River?" to which appellant was reported to have stated, "Let's just say I know you're not going to find the knife."

A discussion then followed, which covered appellant's relationship with his mother. According to Officer Luther's testimony, appellant had, on a prior occasion, choked his mother. Appellant reportedly told this officer that he knew his action in choking his mother was wrong but that he just put it out of his mind like he didn't do it.

The discussion then proceeded to the killing of the victim, and appellant reportedly told this officer, "Don't you think it's possible, (and he kept referring to the doctors) . . . What if a doctor would tell you that I could do something like this and could just put it out of my mind, that I would forget it, that I did something like this?" This discussion ended on a point concerning the appellant's teeth, and appellant reportedly asked the officer, "what if my teeth were off a certain millimeter or something like that, would they still say it was me?"

Trooper Mills then took the stand (in rebuttal) and testified to the events of October 5, 1977. He testified that appellant signed a waiver of rights form. When asked about the knife, he stated appellant asked, "You didn't find it, did you?" and further, "You're wasting your time if you say that you have the knife that was used to kill her. You're lying to me because I know you don't have the right knife." He then asked appellant how he was sure the authorities did not have the right knife and appellant reportedly answered, "I know you will never find the knife that was used to kill her." He asked appellant where he put

the knife and had he thrown it in the Platte River, whereupon appellant answered, "I told you I know that you will never find the knife."

The interview ended at this juncture on the following note. Trooper Mills testified appellant inquired where he might be confined and reportedly told the officers he did not want to go to prison, because he thought he would be killed because he knew other inmates would not like anyone who killed a young girl. Appellant reportedly asked the officers if they would try to get him into the state hospital. After the officers reportedly advised appellant such a matter was between the court and the attorneys, appellant stated, "I am sure they'll convict me if I go to trial and I would just as soon go on to the state hospital now."

The foregoing testimony and all other statements secured from and reportedly given by appellant on the dates of October 2 and 5, 1977, were subject to appellant's motion to suppress, alleging they were in violation of his rights under *Miranda v. Arizona, supra.*

In pretrial matters, the deposition of Marion Beeler, Chief of Police of Raytown, Missouri, and the officer in charge of the Metro-Squad assigned to the instant case, was taken and the testimony reveals that defense counsel had orally advised this officer of his entry into the case.

The record reveals the following chronology of events. On October 1, 1977, appellant was arrested and interviewed while in custody. The record shows, although admonished by his mother not to sign or to admit to anything, that appellant was advised of his constitutional rights as per *Miranda v. Arizona, supra.* The record further shows that appellant knowingly and voluntarily waived his rights regarding the October 1, 1977 interview and the trial court properly admitted such evidence adduced therefrom as part of the state's case in chief.

▮ Defense counsel appeared in Platte City the night of October 1, 1977. This appearance followed the initial interview of October 1, 1977. Such appearance was, however, sufficient under the evidence to put law enforcement officials on notice of counsel's representation of appellant regarding events following the initial interview. While the evidence is unclear as to whether investigating officers were directly advised of defense counsel's appearance by their superiors, the trial court properly suppressed the statements of October 2, 1977 and October 5, 1977 as part of the state's case in chief upon the failure of the state to carry its burden of proof that law enforcement officials did not know appellant was represented by counsel.

If the chain of events relating to the statements of October 2 and October 5, 1977 had ceased at this juncture, such statements would be of no import on this appeal. However, during trial, appellant took the stand in his own defense. During cross-examination, appellant denied committing the offense with which he was charged, testified that the officers were lying about everything about which they testified and offered an alibi defense.

The state, over objection, was permitted to cross-examine appellant about his statements to the officers on October 2 and October 5, 1977. The premise was impeachment upon prior inconsistent statements. In addition, the evidence surrounding the statements of October 2 and October 5, 1977 were admitted over objection as rebuttal evidence for the state.

▮ The question which falls to this court is whether the statements of October 2 and October 5, 1977, not having been admissible as part of the state's case in chief because the obtaining of them violated the rules under *Miranda v. Arizona, supra,* were nonetheless admissible during cross-examination and rebuttal to attack the credibility of appellant on prior inconsistent statements. This question is novel neither nation-wide nor in our own state. It is true that *Miranda v. Arizona, supra,* properly insures to an accused the constitutional protection against involuntary statements while in custody. It is also true that such statements might well be utilized in other fashion during the course of trial.

There are two criteria which must be followed when using statements by way of impeachment and rebuttal. The first is a showing that such statements are voluntary, see *Miranda v. Arizona, supra; Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *State v. Fair*, 467 S.W.2d 938 (Mo.banc 1971) and *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). In the instant case, objection was interposed, but the record does not reflect such objection challenged the voluntariness of the statements and there was no request for an independent formal hearing upon the issue of voluntariness. The court is not required to conduct such a hearing on its own motion, see *State v. Jackson*, 448 S.W.2d 895 (Mo.1970), reaffirmed in *State v. Harper*, 465 S.W.2d 547 (Mo.1971). The ruling on voluntariness, of course, stems from the landmark decision in *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 538 (1964), and such proceedings have been commonly referred to as "*Denno* hearings". Appellant objected and stood upon the principle that since such statements had been suppressed relative to the state's case in chief, they stood suppressed throughout.

The posture of the October 2 and October 5, 1977 statements changed when appellant took the stand in his own behalf. The safeguards of *Miranda v. Arizona, supra*, and other federal and state decisions do not equate with complete prohibition against the use of statements or confessions at other stages of a trial proceeding, see *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). The instant case provides for no prohibition against the use of the statements of October 2 and October 5, 1977 on the grounds of voluntariness. While on this appeal it is argued that since the statements were suppressed in the state's case in chief and they stood as such throughout the trial, there is no showing upon trial at the time of cross-examination and rebuttal that such statements were involuntary; and absent any attempt by appellant to request such a showing, this court is left to merely speculate what such a request, if any, reveals.

Turning to the second criterion, it must be shown that the use of such statements must rest upon the laying of a proper foundation. § 546.260, RSMo 1979 provides that an accused shall not be required to testify on his own behalf, but if he or she elects to do so, he or she is subject to cross-examination and such testimony may be contradicted or impeached in the same manner as the testimony of any other witness in the case.

As regards rebuttal evidence offered as impeaching evidence on prior inconsistent statements, certain limitations have been imposed so as to safeguard the rights of an accused. These safeguards are to test and assure the reliability of the impeaching evidence.

Authority long established in our state provides prior statements cannot be used unless the witness is first asked if he made the statement, see *Huskey v. Kane Chevrolet Co.*, 173 S.W.2d 637, 640 (Mo.App. 1943); attention of the witness must be called to the time, place, circumstances and person to whom the statement was made, see *State v. Bennett*, 87 S.W.2d 159, 162 (Mo.1935); and in order to show by other witnesses prior inconsistent statements of an accused, a foundation must. be laid by interrogating the witnesses concerning the alleged inconsistent statements, see *State v. Thompson*, 280 S.W.2d 838 (Mo.1955). In a more recent decision, *State v. Kelly*, 539 S.W.2d 106, 112 (Mo.banc 1976), citing *State v. Vaughn*, 501 S.W.2d 839, 842 (Mo.1973), the highest court in our state declared, "A foundation must first be laid by asking the witness on cross-examination if he made the statement, and obtaining either a denial or an answer that he failed to remember it." The authority cited herein clearly denotes it is the substance rather than the form of the question or questions that is controlling.

The statements of October 2 and October 5, 1977 were admissible under *Harris v. New York, supra*, if they followed other requirements as to admissibility, see also *United States v. Rooks*, 577 F.2d 33, 37, 38 (8th Cir. 1978), *cert. denied* 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171 (1978), and *United*

*States v. McIntyre*, 467 F.2d 274 (8th Cir. 1972), *cert. denied* 410 U.S. 911, 93 S.Ct. 972, 35 L.Ed.2d 274 (1973). It is against this authoritative background that the admissibility of the instant statements must be viewed.

Before proceeding to take up the evidence in the instant case, it must be pointed out that the prohibition announced in *Mincey v. Arizona, supra*, does not control because admissibility herein does not turn upon the premise of involuntariness as previously pointed out. Further, appellant cites for the court, *State v. Johnson*, 524 S.W.2d 97 (Mo.banc 1975) which dealt with suppression of an undisclosed prior statement. Appellant herein, however, prior to trial, had deposed all of the rebuttal witnesses, and the subject matter of the impeaching testimony and the rebuttal testimony was known to appellant. *State v. Johnson, supra*, turned upon a discovery and not a constitutional question.

Appellant took the stand in his own behalf. On direct testimony, he was asked the following pertinent questions and gave the following pertinent responses:

"Q. Tell us in your best judgment what time did you get home?

A. I got home around about ten-after-four.

\* \* \* \* \* \*

Q. You also heard him [the police officer] state that later that you said that if he would let you talk to your father, you would tell him how Julie was killed; did you make that statement?

A. No, I did not.

\* \* \* \* \* \*

Q. What did they tell you about the bite mark?

A. They said Julie had been bitten on the breast.

\* \* \* \* \* \*

Q. [By Mr. Brown] I'll ask you now, Mark, jam out: Did you kill Julie Wittmeyer?

A. No, I did not kill Julie Wittmeyer.

\* \* \* \* \* \*

(upon cross-examination)

Q. All right. Starting with—when your mother came to get you, did you get in an argument with her?

A. No, sir, we did not.

\* \* \* \* \* \*

Q. Do you remember making this statement to Officer Luther: Mark was asked what time he arrived home and he said he did not have a watch and had to guess at the time and estimated it to be just a few minutes past 4:00 p.m. because his younger brother and sister were watching Gilligan's Island on TV when he entered the house.

A. That is not true.

\* \* \* \* \* \*

Q. Did—Mark was asked what it would take to tell us how—Mark was then asked what it would take to get him to tell us how his teeth impression got on Julie's breast and how Julie was killed—right; did they ask you that?

A. They did ask me that.

Q. Your answer was: 'Mark then replied "If my Dad tells me to tell you, I'll tell you everything and how Julie was killed." '

A. I did not make that statement. I told them I would like to talk to my Dad because I had not done anything.

\* \* \* \* \* \*

Q. . . . Did you ever make the statement to Mrs. Riegelman that you were the last person to see Julie alive?

A. I did not. . . .

\* \* \* \* \* \*

Q. Did you ask the police officer, that is Fred Mills and Mr. Luther talking to you over to the Lexington Jail, did you ask them what physical evidence they had against you?

A. Yes, I did.

Q. What did they reply?

A. They would not tell me.

Q. 'We told him we had searched his house with a search warrant for the knife that was used to kill Julie Wittmeyer.'

A. They did not state that.

Q. They didn't say that? That's a lie? Then you said to them: 'You didn't find it, did you?' Right; did you make that statement?

A. No, sir, I did not.

Q. That's a lie too. 'We told him we found three knives and that we were checking them out. Mark then started grinning and laughed and said "You're wasting your time and if you say that you got that knife that was used to kill her, you're lying to me because I know you don't have the right knife."'

A. I did not make that statement.

Q. That's a lie, too?

A. Yes, it is.

Q. 'He then started laughing again and said "I know you will never find the knife that was used to kill her."' You say that?

A. No, sir, I did not.

Q. 'We then asked Mark where he put the knife and he just smiled and said "I know you will never find it."'

A. I did not make no statement.

Q. 'When we asked Mark if he threw it in the Platte River', which was flooding at the time, by the way— 'Platte River, and he continued to smile and said "I told you I know that you will never find the knife."'

A. I did not make that statement.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. [By Mr. Allred] Do you recall the officers—again this is the officers who came over to interview you on the 5th of October; okay?

A. Yes.

Q. You are oriented as to the place we are?

A. Yes. Lexington Jail, we're at the Lexington Jail.

Q. Right. October 5, 1977.

A. Yes.

Q. And did you tell the police, do you recall the police asking you if you really thought you could forget something as terrible as this killing was?

A. Repeat the question.

Q. Do you recall telling the police, telling you could you really forget something as terrible as killing someone?

A. No, I did not make that statement.

Q. Did not. Did you tell them one time you choked your mother and you knew it was wrong, but were you able to put it out of your mind?

A. No, I did not state that.

Q. That's a lie too. Did you ask the police officers if they would try to help you get you into the State Hospital?

A. Did I ask them?

Q. Yes.

A. No, I did not.

Q. Did you tell the police that you would rather not go to prison for murder because you thought they— you'd be killed by the other inmates?

A. No, I did not.

Q. Because you were sure other inmates wouldn't like anyone who killed a young girl?

A. That is what they told me. They said people down at the prison would not like what I—what they had done, and I told them that that just to leave me alone.

Q. Just to leave you alone.
Then did they ask you—I mean, then did you ask then if they would try to help you get into the State hospital instead of the penitentiary?

A. No.

Q. To get some treatment and some help?

A. No, sir.

Q. Okay. That you would rather do that than go to prison; you didn't say that?

A. No, sir, I did not.

Q. Did they tell you this would have to be something worked out between your attorney and the Court and then did you say 'I am sure they'll convict me if I have to go to trial and I would just as soon go to the State Hospital now'? Did you make that statement?

A. No, sir. Mr. Luther and Mr. Mills did not ask me any questions at all."

The foregoing testimony as regards both cross-examination and rebuttal provides the record with the determination of whether or not such evidence met the requirements of federal and state authority to warrant its being admitted.

Appellant's attention was directed to the time, place, circumstances and person to whom the statement was made, *Huskey v. Kane Chevrolet Co., supra*; a foundation was laid for introduction of rebuttal evidence, *State v. Thompson, supra*; appellant was asked if he made the statements and was permitted the opportunity to deny making such statements or to state his failure to remember making such statements, *State v. Kelly, Harris v. New York* and *United States v. Rooks, supra*.

As the record reveals herein, the state was attacking the credibility of appellant, which is an acceptable adversary practice in an attempt to gain the truth within the trial of a lawsuit. That such is permissible, see *State v. Moore*, 546 S.W.2d 10, 13 (Mo. App.1976).

While the rules of *Miranda v. Arizona* and *Mincey v. Arizona, supra*, properly safeguard the constitutional safeguards of an accused, such rules do not extend to bar the use of all such statements in criminal prosecution. As was clearly and properly pointed out in *Harris v. New York, supra*, 401 U.S. at 225–226, 91 S.Ct. at 645–64.

"Every criminal defendant is privileged to testify in his own defense, or refuse to do so. But that privilege cannot be construed to include the right to commit perjury . . . (citations omitted) . . . Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process. Had inconsistent statements been made by the accused to some third person, it could hardly be contended that the conflict could not be laid before the jury by way of cross-examination and impeachment.

The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances."

The instant case clearly falls within the rule of *Harris v. New York, supra*, and within the rules established by our own courts regarding impeaching testimony.

The trial court properly permitted cross-examination of appellant upon prior inconsistent statements for purposes of testing his credibility. The further ruling to permit rebuttal evidence upon the same premise was clearly within the rules and authority for the admissibility of such evidence. Sufficient foundation was laid to test and establish the trustworthiness of such evidence and the trial court's ruling that such was admissible was clearly proper.

The contention of appellant that because the court had suppressed the statements of October 2 and October 5, 1977 regarding the state's case in chief, such statements must be suppressed for all purposes, cannot stand in light of the lack of evidence that such statements were involuntary. During these meetings, appellant was advised of the *Miranda* warning, he voluntarily engaged the officers in conversation about the case and at no time did appellant insist on his right to remain silent or to have counsel present.

■ The trial court's ruling that the statement of October 1, 1977 was admissible in the state's case in chief was proper upon

appellant's failure to show such statement was involuntary under *Miranda v. Arizona, supra.* The trial court's ruling that the statements of October 2 and October 5, 1977 were inadmissible in the state's case in chief was proper upon a finding that the state had failed to carry its burden showing the state was not aware of the entry of defense counsel at the hearing upon the motion to suppress. The ruling of the trial court, upon the use of the statements of October 2 and October 5, 1977, for cross-examination and the admissibility thereof as rebuttal testimony, was proper for purposes of impeachment upon prior inconsistent statements under *Harris v. New York; United States v. Rooks; Huskey v. Kane Chevrolet Co.; State v. Thompson; State v. Bennett; State v. Kelly* and *State v. Vaughn, supra.*

Point one is ruled against appellant.

Appellant's second contention of error is that the trial court erred as a matter of law and abused its discretion by allowing the state's witnesses to give their opinions, over objection, as to the person who placed the bite mark on the breast of the victim. Appellant's alleged error is further subdivided upon the contention that the science of bite mark identification has not reached the stage of scientific reliability and credibility to permit its use as evidence in criminal trials; the state's witnesses were not sufficiently qualified as experts to offer an opinion as to the identity of the perpetrator of the bite mark and the factual basis of said opinion was not supported by reliable and competent evidence.

Appellant's contention presents to this court three questions, one of which relates to a broad general question regarding evidence and the remaining two as to whether or not the evidence in the instant case supports or fails to support appellant's contention. These questions are as follows:

(1) Has the science of bite mark identification developed to such a degree as to its reliability and credibility to permit its use as evidence in criminal proceedings?

(2) Does the evidence show or establish the qualifications of the state's witnesses as experts, enabling them to render an expert opinion?

(3) Was the factual basis which served as the basis for expert opinions herein supported by reliable and credible evidence?

The second alleged error posed by appellant forces consideration of the field of forensic odontology, which has been defined as the application of the science of dentistry to the field of law, and represents one of many fields which comprise the forensic sciences. Forensic dentistry is synonymous and interchangeable with the designation, forensic odontology.[6]

The entity of forensic dentistry comprises four major areas of interest:

(1) dental identification of the unknown body

(2) bite mark comparison

(3) trauma and the oral tissues

(4) dental malpractice and negligence [7]

The first recorded case involving forensic odontology was the celebrated case of *Commonwealth of Massachusetts v. Dr. John White Webster,* decided in 1850. The victim's body had been burned in a furnace to a point where ready identification was impossible. Among the remains was a crushed skull and a portion of a porcelain denture. The victim's dentist was permitted to testify. Waxups and impression models were permitted to be introduced by the trial court. There was defense evidence opposing the state's evidence. The court held that the credibility of dental evidence was a matter to be decided by the trier of fact. In essence, forensic dentistry was thus born.

Since the *Webster* decision, countless occasions have arisen where the practice of forensic odontology has been applied. It was used to identify thousands of victims of the Nazi horror after World War II. Other

---

**6.** An appendix reflecting the research material utilized by the court herein relative to bite mark identification is attached hereto for use by the reader.

**7.** I. Sopher D. D. S., *Forensic Dentistry* (1976)

occasions have included victims of bombings, fires, drownings and other, both singular and en mass, situations where this scientific process has been put into operation.

The matter before this court, of course, comes within No. 2 of the above definition. It might be asked if, how and when do our courts exactly determine the admissibility of new scientific techniques. The general rule for determining such admissibility was laid down in *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013, 1014 (1923). That rule is as follows:

> "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." ·

Appellant, under his second point of error, makes a three-pronged attack outlined by the three foregoing questions. The following resolve of this alleged error calls for the combined consideration of the evidence upon the record, coupled with research within authoritative text material which speaks to this scientific area. That which follows is the evidence provided by the experts upon the record interrelated with information secured from various authoritative text materials. It is urged that the appendix attached hereto be referred to as the main reservoir of source material on the subject matter in general.

The prosecution presented expert witnesses who testified as to the method and procedures used to (a) photograph the bite mark upon the victim, (b) obtain impression and prepare casts of appellant's dentition and (c) arrive at a final conclusion that the bite mark upon the victim's body was made by the person from whom the casts were made.

Stephen Warlen, a latent print and photographic technician assigned to the Regional Crime Lab was qualified as an expert.[8] He was present on September 6, 1977 at the Rollins Funeral Home. He took photographs of the bite mark on the victim's breast. These photos were taken with a Nikkormat 35mm camera, with a Nikkor Micro-lens mounted upon a tripod, along with a Honeywell Strobonic electronic flash. Kodacolor 200 film was used. In all, 17 photos were taken. While the photos were being taken, a flexible ruler was placed alongside the bite mark so the negative and resulting print were accurately enlarged to reflect an actual size of the breast. This provided a "one-to-one" sized print and negative. The photos were taken in the presence of the county coroner, another employee of the Crime Lab and a dentist, Dr. Ira Gladfelter. The photos and negatives were marked as evidence and transported by Sheriff Thomas to Dr. Luntz in Connecticut. The prints and negatives were introduced into evidence.

Dr. Jon Finley, a practicing dentist, was qualified as an expert witness. He testified that on September 30, 1977, he took dental impressions of appellant at Menorah Hospital. Dr. Finley testified that to secure the impressions, he performed the following: (a) he mixed an irreversible hydrocolloid alginate which was used to make 3 sets of impressions and a polyether which was used to make one set of impressions; (b) he placed the mixture in metal trays which one by one were fit over appellant's teeth and after allowed to set on the teeth, the trays were gently but firmly removed from appellant's mouth; (c) the impressions were visually checked for defects (one alginate unit but not the whole set was discarded); (d) the impressions were transported to his office (the alginate sets were inside damp paper towels and the polyether transported dry in a box); and (e) at his office he made out of dental stone one cast from each alginate impression and two from the polyether impression.

8. See appendix for statement of all expert witnesses' qualifications.

Dr. Finley found imperfections in the casts on the gum tissue, but none on the tooth portion of the casts. He further testified that after many years of dental practice, including examination of a large number of teeth, he had never discovered any teeth of two individuals to be exactly the same.

Dr. Lester Luntz, a dentist in Hartford, Connecticut and qualified as an expert witness, testified that on September 21, 1977, Sheriff Thomas brought to him the photographs and negatives made by Mr. Warlen. Enlargements of the negatives were made to achieve a one-to-one ratio, and a transparency of the bite mark was made, creating a master black and white negative. On October 1, 1977, Sheriff Thomas returned with the casts of appellant's teeth.

Dr. Luntz then testified to his comparison methods. He first determined the bite mark was of human as opposed to animal origin. He proceeded to orient the bite (i. e., studying the bite mark thoroughly to see any details present and to determine which teeth were upper and which were lower). He then attempted to develop the relationship between the casts and the bite mark. This first step of comparison was an attempt to exclude the casts as having produced the bite marks. Since exclusion was not possible, he then compared individual marks with individual teeth, and individual identifying features in the bite marks were isolated.

Dr. Luntz testified that he assigns value to the identification of any one tooth and looks for specific identifying features such as shapes, higher and lower edges, chipped or poorly developed teeth and the alignment of the teeth. Following this, Dr. Luntz identified the following features of appellant's dentition: (a) poor alignment, a shift to the left of the lower teeth; (b) lower incisors displaying a lingual tilt (toward the tongue); (c) lower right cuspid tilted outward and lower left cuspid tilted inward; (d) presence of three mamalons on the facial surface of the two first incisors (this indicates young age); (e) upper and lower teeth at different elevations and (f) lower left first incisor worn and lower than other teeth.

In the process of comparison, Dr. Luntz testified that he first oriented the midline on the cast and the photograph of the bite and then worked backward, comparing upper and lower teeth with upper and lower marks on the photograph. No point system was used, rather, on overall relationship of cast to the marks, determination of the number of teeth producing the marks, observation of the relationship between the two jaws and comparison of individual details of each particular cast was made.

Dr. Luntz's concluding opinion included the admission of no standard procedure for arriving at conclusions by forensic odontologists, and the system he used would not necessarily be used by all experts. He explained, however, that even though different systems might be used, the conclusions reached would be the same. He further concluded that no two people could have identical mouths. It was his opinion that one discrepancy between a bite mark and a set of teeth would rule out a suspect. He stated that each case was individual in nature, and that saliva tests,[9] impressions or photographs prior to autopsy were not essential.

Dr. Luntz concluded that the bite mark reflected in the photograph of the breast of the victim was beyond a reasonable doubt placed upon the victim's breast by appellant.

Expert testimony on behalf of the prosecution continued with two experts from England. Mr. Roger Summers was qualified as an expert in police photography. He testified that State's Exhibits Nos. 51–61 and Nos. 78–88 were prepared from one original photo from the Regional Crime Lab and photographs were taken of the duplicate cast made by Dr. Furness. (These were photos depicting Dr. Furness's com-

**9.** Tests show blood types in about 80% of cases can be determined from human saliva due to the secretion of blood in saliva.

parisons). Mr. Summers explained that the original color photograph was a one-to-one reproduction of the bite mark with a ruler scale. He also made a one-to-one negative of this photograph and transposed this to a one-to-one black and white print. In this process, a fine screen of 188 lines per inch was placed over the focus mechanism of the camera. Accuracy of the photo was checked by counting these 188 lines by a microscope. The ruler used was one passed by the National Physical Laboratory as being 100% accurate. It was Mr. Summers' opinion that this method reproduced an accurate one-to-one photograph and negative. In this process, tungston lighting, a four-by five camera, fine grain film and resin coated paper were employed to guard against shadows, shrinkage and expansion, which if allowed, would have caused distortion.

Dr. John Furness of Liverpool, England was qualified as an expert. He testified that Deputy Deister delivered to him a one-to-one colored photograph of the victim's right breast, along with the dental casts of appellant. Dr. Furness made exact duplicates of the casts of appellant's dentition. He further requested and supervised the photography of Mr. Summers. He testified that in his attempt to locate points of dissimilarity, he compared the original colored photo and the casts of both the upper and lower teeth on the photo and found "points of compatibility". He then turned his attention to looking for points of similarity. He first determined that the bite mark represented in the photo was human in origin, being made by four upper teeth (outer surfaces of the four upper incisors were found) and five lower teeth (made by the front lower left cuspid, lower left second incisor, lower left first incisor, lower right first incisor and lower right second incisor). In making this examination, Dr. Furness testified he found 52 points of similarity between the casts and the photo of the bite mark.

Dr. Furness testified he had viewed approximately 150 bite mark cases and that if one dissimilarity appeared, this would exclude the person as a suspect. He further stated that although it might appear to the layman that bite marks appear similar, it is impossible for two humans to make exactly the same bite mark. He explained his analysis depicted in the visual aids used as exhibits explaining how the teeth corresponded to the bite marks, describing the reasons for assigning each of the points of similarity. The points of similarity were assigned on the basis of corresponding positions, high spots, spacing irregularities and outer surfaces of the teeth. He denied that embalming a body would distort a bite mark. He concluded that in his opinion, "based upon reasonable medical and dental certainty" that the person from whom the casts were obtained inflicted the wound depicted in the colored photograph. It was his opinion that appellant was the perpetrator of the bite mark.

The defense countered with its own expert evidence. The first expert was William Nott, an experienced photographer. He testified as to the procedures and techniques he employed concerning preparation of the defense exhibits. He prepared a one-to-one photo of the right breast of the victim. This photo became defense exhibit No. 36 and was derived from negatives of the same body area, and these negatives were state's exhibits Nos. 46 and 50.

Additional defense expert testimony was provided by Dr. Edwin Everett Andrews of Oklahoma City, Oklahoma. Dr. Andrews was qualified as an expert witness.[10] He testified as to the procedures and techniques he employed and the conclusions he reached regarding the bite mark evidence. On April 29, 1978 [11], Dr. Andrews examined appellant's dentition. He, at the same time, took numerous photos of appellant's teeth. He made an upper and a lower impression of appellant's dentition. On April 30, 1978, Dr. Andrews proceeded to the Regional Crime Lab and was shown certain evidentiary objects. These items included photos

---

10. See appendix for qualifications.

11. Transcript read 1977, but the proper date reference is 1978.

of appellant's dentition, along with photos of the right breast of the victim. In addition, Dr. Andrews was handed a cast or impression of appellant's dentition.

Equipped upon trial with the cast or impression of appellant's dentition (state's Exhibit No. 31) and the applicable photos (state's Exhibit No. 58), the doctor in front of the jury demonstrated how he placed the cast or impression of appellant on the photo. After this demonstration, the doctor, as follows, continued:

"A. At that time we showed the upper mark here on the breast and we showed a round mark to the left of the oblong one here and a round mark on the right. We then looked at Mark Sager's dentition and by placing Mark Sager's dentition in this position on a flat surface, with the two cuspids or eye teeth in contact, it is very obvious that the two front teeth or central incisors and the two lateral teeth, lateral incisors, are not making contact with the flat surface. We call this being above the plane of occlusion. Therefore, if this model were to cause a mark in a soft substance such as human flesh, these two teeth would have to proceed—[interrupted]

\* \* \* \* \* \*

Q. [By Mr. Brown] continue, Doctor.

A. These two teeth would have to proceed into the tissue ahead of the teeth that are above the plane of occlusion. When we look at this photograph and this mark, and we place Mark Sager's model, and these areas and we will show this in here, we see that there's no cuspid mark on this side. This cuspid is not marking in here, and if we look over on this side, this cuspid is not marking in here. May I mark there for the jury's benefit?

\* \* \* \* \* \*

A. This point here is missing, cuspid mark, and this cuspid mark is missing here. They are not on the picture. To me, that represents two discrepancies, and in bite mark evidence, when you have a discrepancy, you have to completely eliminate that person as having caused the bite mark. We also look at the photograph and we see these two rounded objects to the left and to the right of the two central incisors. See where they are rounded here and here? See that? Everyone see that? The marks in there are definitely rounded. Now, bite mark evidence is basically very similar to tool marks. If you have tool marks, you have to show an imprint of the tool on the surface that was applied to. If we look at this dentition of Mark Sager's, these are the incisal edge, the cutting edge of these teeth are rectangular, like a little rectangle, the centrals are rectangle. The lateral incisors, the one next to them, are rectangular, and the cuspids are pointed. And there is no way that a rectangular surface can cause a rounded bite mark on a surface. And with two rounded marks here and two rectangular tools here, I have to assume that this model could not have caused that bite mark, because the tool does not match the surface it was applied to. So we have an area now of four discrepancies. We have no cuspid mark and we have the wrong shape for the lateral incisors.

Q. Resume your seat, now, Doctor.

Now, at that time you were using the dentition that was supplied to you by the Crime Lab which represented to you to be the dentition of Mark Sager; is that true?

A. That is correct.

Q. And you also had the benefit of the day before of actually personally examining the defendant Mark Sager?

A. That is true.

Q. And as to these cuspids, were they on April 29, 1978, were those cuspids in the mouth of Mark Sager as prominent as they appear on that model?

A. They were.

Q. Did you measure with some type of device the distance that these cuspids stick out over the flat plane, or maybe I'm not using the right language.

A. The cuspids extend roughly a millimeter-and-a-half below the incisal edge of the lateral incisors.

Q. Did you later receive by mail some black-and-white photographs that matched and were the exact duplicates of Photograph 1 of Exhibit 58–A?

A. I did.

Q. I'll hand you what's been marked Defendant's Exhibit 22–L, ask you to check that photograph, Doctor. I'll ask you if that is—wait a minute. Did you have some prints made off the black-and-white print that you received?

A. First I received the print.

Q. What was your next procedure?

A. I then had numerous copies made of this one-to-one photograph in monocolor.

Q. Who made those for you?

A. Mr. Richard Reed.

Q. Were they made to your specifications?

A. They were.

Q. What were your specifications with relationship to 22–L, which you have indicated, stated is an exact duplicate of 58–A–1?

A. I asked him to correct the scale so it was one-to-one, because there is a slight error in that book.

Q. You mean in this book?

A. In that book. And I asked him on his duplication to make sure he corrected it with his enlarger to get it exactly one-to-one, which he did.

Q. Is it necessary to have that as closely one-to-one as possible in order to give an accurate opinion later on about what it shows?

A. It is very necessary, because we're dealing with marks that are of a millimeter length, which is very fine."

The evidence further reveals Dr. Andrews then secured the assistance of a live model which, in his judgment, approximated the size and weight of the victim. He wanted to reproduce or recreate the situation in the death of the victim. The casts or impressions of appellant's dentitions were placed on the model's right breast. From this experiment, the Doctor testified:

"Q. So then when you used the actual dentition—dentition, I'm going to get it yet—that you had of Mark Sager, right on your live model and attempted to duplicate that bite, the dentition of Mark Sager definitely left two cuspid marks on her breast?

MR. PLUMB: Objection. Leading the witness.

THE COURT: Objection will be sustained. Reframe your question, counselor.

Q. [By Mr. Brown] Did the models of Mark Sager leave cuspid marks on the breast of your volunteer?

A. They did. Now, may I say something else?

MR. PLUMB: Objection. There's been no question asked.

THE COURT: Ask your question, counsel.

Q. [By Mr. Brown] You have some explanation of that particular point?

A. We got cuspid marks on the breast. We also got a linear pattern, rectangular pattern for the lateral incisors on that experiment also.

Q. Did that bear out your initial judgment that you formed from looking at Photograph 1, 58–A, Exhibit?

A. It did.

Q. Were there any other discrepancies shown by this bite that was made upon your model as opposed to that photograph?

A. At that time a fifth point of discrepancy came into plain view, and that is the arch form, the curvature of the bite mark was different than the curvature of the mark on the one-to-one photograph.

\* \* \* \* \* \*

A. We then wanted to test it farther [sic], so we took the articulated models that we had, and we proceeded to the morgue of the Chief Medical Examiner for the State of Oklahoma. In the morgue, we found a female cadaver of rather small breast size, and we once again established our 27mm. opening and we pressed the articulated models into the breast of the cadaver material as firmly as we could.

Q. Is that the articulated models of Mark Sager's dentition?

A. Those were the articulated models of Mark Sager's dentition.

Q. Did Mark Sager's dentition leave cuspid marks on this material, this cadaver?

A. Mark Sager's teeth left cuspid marks on that cadaver. They also left linear lateral incisor marks, very similar to the marks on the live model."

Following this procedure and additional thereto, Dr. Andrews secured several models of upper and lower dentitions and made comparisons with appellant's dentition. It was this witness's opinion that out of 75 such models, he found eight cases that had the same number of similarities to the bite mark, represented by photo, upon the victim's right breast. Dr. Andrews testified that one major discrepancy rules out any one suspect. After giving the details of his procedure and technique, Dr. Andrews stated his opinion, which was as follows:

"Q. It appears from the testimony of the medical witnesses that have tes-

tified ahead of you that there is one standard in the forensic odontology field limited to bite marks, that if you find one major discrepancy, then you have to rule that person out as the perpetrator of the bite mark. Do you agree with that presumption?

A. Absolutely, because there is no standard at this time for point numbering, for point numbering system for inclusion of positive statements as to who could have caused the bite mark. Therefore, with one discrepancy, we have to throw that person out as a suspect. At this time I have found five discrepancies and dissimilarities.

Q. Doctor, based on all of your procedures and your education and your experience, in your work, do you have an opinion based on medical certainty, medical and dental certainty as to whether or not Mark Sager placed the bite upon the breast of Julie Wittmeyer?

MR. PLUMB: Objection. No proper foundation has been laid to show this man's an expert nor to show—find the materials used were accurate and proper.

THE COURT: Objection will be overruled.

A. I have an opinion.

Q. [By Mr. Brown] What is that opinion, Doctor?

A. That no way can Mark Sager have caused that bite mark, because the bite mark that we made with Mark Sager, no way compared with the exhibit on the one-to-one photograph."

In rebuttal, the state recalled Dr. Finley, who testified that he had compared the casts he had made on September 30, 1977 with the casts made by Dr. Andrews on April 29, 1978. Dr. Finley's opinion concluded that his models reproduced more accurately the gum tissues of appellant's dentition; that there was a difference in the posterior back teeth of the two models and

most importantly, that the front teeth were more ragged on his casts of September 30, 1977 and that the right canine tooth had also a more pronounced point as compared with the casts of Dr. Andrews under date of April 29, 1978. Dr. Finley testified that the casts he made on September 30, 1977 were accurate reproductions of appellant's dentition as of that date.

During the trial (noon recess) Dr. Finley examined appellant's teeth in the presence of Dr. Andrews. Dr. Finley on rebuttal, testified that the casts made by Dr. Andrews reflected the present condition of appellant's teeth, but he added the change in appellant's teeth, representing the difference in the casts between September 30, 1977 and April 29, 1978, could not have occurred in such a short period of time by normal wear, but that such change could have been caused by artificial means.

Dr. Andrews was then recalled as a surrebuttal witness. He was asked that if during the trial recess in the presence of one of the state's experts, he had examined appellant's dentition. The following reveals the evidence on this point:

"Q. During the recess at lunch in the presence of Dr. Jon Finley, did you have an opportunity to again examine the mouth of Mark Sager?

A. I did.

Q. In the presence of Dr. Jon Finley, did both of you medical witnesses compare Defendant's Exhibit 31, State's Exhibit 31 and Defendant's Exhibit 40?

A. We did.

Q. Did you reach any conclusion about whether or not there were some changes in the dentition of Mark Sager's mouth from the time of his models were taken on September 30 to the present date?

A. There were some very minor differences in the incisal edge height.

Q. Is that on the lower model or upper model?

A. On the lower dentition.

Q. You found no differences in the upper dentition?

A. No difference.

Q. Would you explain to the jury what in your opinion, your professional opinion, based on your medical expertise and your experience, what could have caused those differences?

MR. ALLRED: I Object, calling for a conclusion, invades the province of the jury.

THE COURT: Objection overruled in view of the inquiry on the rebuttal.

Q. [By Mr. Brown] Based on your professional expertise and your experience and actually looking at Mark's mouth, checking the models, can you tell this jury in your opinion what caused those changes, those minor changes that you have just spoken of?

A. Yes. The changes we are talking about are less than a half-a-millimeter, which is—with the type of rulers and equipment we are using is practically imperceptible. Now, when teeth develop and erupt, they develop little festoons on the incisal edges. There are three on each tooth. These little festoons are called mammillons, and they are part of the normal development of each tooth because labial or outside surface of each tooth develops from three centers of growth. When the tooth is in the bone and developing, when the teeth erupt it is normal for these three little ridges to be seen. They are usually most prominent on the primary dentition of young children. As we get older, we wear this, these mammillons off and this wear pattern continues for the rest of our life. When we're under a stressful situation—[interrupted]

*    *    *    *    *    *

Q. [By Mr. Brown] Doctor, you needn't go further on that. Did you find any changes whatsoever, though, in the upper area where you have found your discrepancies?

A. No changes whatsoever.

Q. There is no change at all in that discrepancy situation.

A. No."

Upon cross-examination in surrebuttal, Dr. Andrews was asked the following questions and gave the following responses:

"Q. Doctor, the truth of the matter then is very simple: Dr. Furness was working with a different set of teeth taken at a different time than you were?

A. He was absolutely not working with a different set of teeth. There is no change whatsoever in alignment or cusp height, that's less than half-a-millimeter. These teeth were worn down because that boy was in a terrible stressful situation and that would cause wear.

Q. They were different, weren't they?

A. They were less than half-a-millimeter difference [sic].

Q. Just answer my question.

A. They were less than half-a-millimeter different.

Q. Just answer my question.

A. That's all I'm doing.

Q. Yes or no.

MR. BROWN: I object. He's arguing with the witness. The answer has been given.

THE COURT: Objection will be overruled.

Q. [By Mr. Allred] Will you answer, Doctor? There is a difference in those models, isn't there.

A. Less than half-a-millimeter.

Q. I'm not asking you that. You can tell me yes or no. There is a difference?

A. Very slight difference."

What the foregoing evidence reveals is that not-too uncommon situation of differing expert opinions. This evidence does, however, permit this court to reach an answer regarding questions two and three above. The evidence clearly established the qualifications as experts the witnesses for both parties to the instant case, enabling them to render an expert opinion. Question No. 2 is answered in the affirmative. The evidence further reveals that there was reliable and credible evidence supplying the factual basis which in turn served as the basis for rendering an expert opinion. The evidence, in addition to numerous pages of transcript of expert testimony, included more than 80 exhibits, consisting of transparencies, photos, negatives, casts or impressions of appellant's dentition and the demonstration of these exhibits before the jury. Question No. 3 is answered affirmatively.

While the experts in the instant case arrived at opposite ends of the conclusion spectrum in their interpretation of the particular evidence, one common denominator emerges from their voluminous testimony and the extensive number of exhibits. That common denominator is that forensic odontology, inclusive of bite mark identification, is an exact science. It is exact in the sense that through acceptable scientific procedures, an expert can form an opinion useful to the courts in their quest for the truth.

In turning to Question No. 1 above, this court, although the benefactor of the expertise upon this record, also bears the obligation to research still further the entire question. An appendix is attached for detailed reference to authoritative text material utilized in such research.

Research and study of the authoritative text materials by experts in the field permit the drawing of certain conclusions. The experts generally agree that forensic odontology, inclusive of bite mark identification, is an exact science; that expert skill, knowledge and training are necessary, and when acceptable techniques and procedures are adopted, an expert opinion can be postulated as an aid to the courts.

Differences existing between the experts appear to rest upon two basic points. One such difference rests upon the methodology employed. Research reveals that some experts follow the practice of making var-

nished dental casts, applying printers ink to the incised surface and transferring the imprint on to transparent paper. This transparency would then be superimposed upon a life-size bite mark photograph for comparison. This has been referred to as the Sorup Method. Another procedure included reproduction of tissue consistency by placing bakers dough upon sponge rubber around a center pole. The dental models would then be articulated, a bite mark produced and a comparison then made. This has been referred to as the Buhtz-Erhardt method.

Another procedure, referred to as the Morgan method, consists of making models of both the bite mark and the suspect's dentition. Black paint is then applied to highlight the indentations so only the incisal and occusal surfaces remain bare. Negatives of both the bite mark and the suspect's casts are superimposed for comparisons.

Yet another method, introduced in 1968, utilizes comparison photographs of the bite mark and the suspect's casts. This method has been considered as being similar to tool mark and ballistic comparison. This method calls for:

(a) an enlarged photograph of the bite mark to be made;

(b) printers ink to be applied to the incisal aspects of the suspect's models

(c) photographs of the front (labial) and top (occlusal) view of the casts to be made. These photographs are printed to correspond in size with the previous enlarged bite mark photographs

(d) the enlarged photographs of the bite mark and suspect's models to be mounted adjacent to each other on cardboard and lines to be drawn indicating similarities.

This method, referred to as the Furness method, was that followed in the instant case by the state's expert and has been hailed as an excellent method for presentation of evidence to a jury.[12]

On the question of method, one leading expert has declared, "It is important to realize that there exists no single method which must be utilized in bite mark studies . . . and the particular method or methods employed depend upon the circumstances of the individual case and the preference of the analyst."[13]

The second basic disagreement between the experts appears to rest upon the lack of a universal methodology unsupported by a core of basic data for comparison. While most experts agree that such basic core data would enhance the specificity of any given case, they also seem to agree that the absence of such data is not an element which defeats this scientific procedure. The absence of such core data was likened to the early days of fingerprinting and has been best summarized as follows:

"The situation is comparable to the point in the distant past when the 100th set of fingerprints was classified. At that time, it was known that the set of prints did not match the ninety-nine others previously recorded but it was not known if the set of prints were specific for only the one individual fingerprinted. Today, after categorizing 84 million sets of fingerprints in the United States it can be stated with certainty that no two sets match. The present bite mark specificity is comparable to the 100th fingerprint case example."[14]

For a cogent reference as to bite mark identification, one should refer to an article by S. Keiser-Nielsen, *Forensic Odontology Cases and Comments,* Legal Medical Annual (1970); *Proof of Facts,* (Annotated), 25 Am.Jur. (1970) and *Proof of Facts* (Annotated), 25 Am.Jur. (Supplement) (1979). For an interesting and informative critical analysis of why such evidence should not be admissible, see *The Admissibility of Bite Mark Evidence,* 51 So.Cal.Law Rev. (1978).

The admissibility of bite mark identification has confronted the courts before in other jurisdictions. That such evidence has

**12.** *Forensic Dentistry*, n. 7, *supra.*

**13.** *Forensic Dentistry*, n. 7, *supra.*

**14.** *Forensic Dentistry*, n. 7, *supra.*

been held to be admissible is seen in the following cited authorities. *State v. Garrison*, 120 Ariz. 255, 585 P.2d 563 (1978) was a murder case wherein the court admitted into evidence the conclusion of an expert witness that the probability of the bite marks on the breast of the victim were not made by the accused was 8 in 1,000,000 wherein the evidence revealed such probability was not a matter of mere mathematical calculation but was based upon articles written in journals of the *American Academy of Forensic Sciences* and other texts. *People v. Slone*, 76 Cal.App.3d 611, 143 Cal. Rptr. 61 (1978), involved a murder conviction wherein the court held the general test for determining admissibility of new scientific techniques is whether or not the thing from which the deduction is made is sufficiently established to have gained general acceptance in the particular field in which it belongs. In *People v. Slone, supra,* the court held that evidence relating to bite marks had to meet the "three prong test" which provided (a) general acceptance, (b) that the witnesses providing testimony were qualified experts and (c) a demonstration that correct scientific procedures was used. This case also reaffirms California's acknowledgment of the rule in *Frye v. United States, supra,* and reaffirms the rule laid down in a preceding California decision, *People v. Marx*, 54 Cal.App.3d 100, 126 Cal. Rptr. 350 (1975), which was the landmark decision on bite marks in California. *People v. Watson*, 75 Cal.App.3d 384, 142 Cal. Rptr. 134 (1977) involved a murder conviction where color slides of bite marks were held admissible to illustrate expert testimony. The case of *People v. Marx, supra,* emphasized that the bite marks on the victim's nose were held admissible, and further ruled that an accused has no constitutional right to refuse the making of a cast of his teeth.[15] *People v. Johnson*, 8 Ill.App.3d 457, 289 N.E.2d 722 (1972) involved a conviction for burglary, rape and battery wherein the court held that there was no error in recalling the dentist who had made a cast of the defendant's teeth, this cast serving as the basis for the oral pathologist's opinion that

it was highly probable that the bite marks on the victim's breast were made by defendant's teeth, although the dentist in his initial testimony had failed to identify the defendant as the person from whom the dental cast had been made, since no question as to the integrity of the exhibit or new facts had arisen and there was no dispute concerning the identity of the exhibit.

In 1976, the Appellate Court of Illinois, First Division, affirmed the bench tried conviction and sentence of 90 to 175 years in the penitentiary regarding an accused named Richard Milone, see *People v. Milone*, 43 Ill.App.3d 385, 2 Ill.Dec. 63, 356 N.E.2d 1350 (1976). This case involved the murder of a 14 year-old girl. Her body was found with multiple wounds. A critical part of the evidence centered upon identification of bite marks found upon the victim's thigh. In all, seven dental experts testified at trial. Three experts appeared for the state. Four were presented on behalf of the defendant. These two groups of experts disagreed over the identity of the accused as the perpetrator of the bite mark. The accused challenged such evidence under *Frye v. United States, supra,* and the court ruled that such evidence was admissible. The accused further challenged the admissibility of such evidence under *People v. Jennings*, 252 Ill. 534, 96 N.E. 1077 (1911). The court, in affirming the conviction, held at 2 Ill.Dec. at 70, 356 N.E.2d at 1357 that "a lack of complete unanimity in the medical profession as to the reliability of certain scientific testimony does not mean that such testimony fails to satisfy the requirements of *Frye* or *Jennings*."

While the conviction in *People v. Milone, supra,* still stands, that was not to be the last word on the subject. One of the defense experts, Dr. Lowell J. Levine, D.D.S., claims in an article entitled *Forensic Dentistry: Our Most Controversial Case*, printed in *Legal Medicine Annual,* (1978) and written by Cyril H. Wecht, series editor, that subsequent to the Milone conviction,

---

**15.** *People v. Marx, supra,* was criticized in 51 So.Cal.Law Rev., *supra.*

one Richard O. Macek, who had been charged with other rapes and murders tendered a written confession to authorities of the murder for which Milone stood convicted. It appeared that a 23 year-old mother and her 4 year-old daughter had been murdered in Crystal Lake, Illinois. Bite marks were found on the right breast of the mother. It was contended by Dr. Levine that the bite mark on the mother, in the one case was identical to the bite mark on the thigh of the victim in the *Milone* case. The article pointed out that such a conclusion was reached by comparing dental x-rays to photographs. No dental casts were obtained because Richard O. Macek, for no apparent dental reason, had undergone a complete dental extraction. It is the contention of Dr. Levine that the bite mark on the 14 year-old victim in the *Milone* case and the bite mark on the murdered 23 year-old mother mentioned above were inflicted by the same person, to-wit: Richard O. Macek, not Richard Milone.

*Niehaus v. State*, 265 Ind. 655, 359 N.E.2d 513, *cert. denied* 434 U.S. 902, 98 S.Ct. 297, 54 L.Ed.2d 188 (1977) involved a murder conviction affirmed on appeal, wherein the court held that evidence comparing marks in human tissue to the teeth of a suspect was admissible even though that procedure has had limited application because it consisted of standardized procedures known to procure accurate models and measurements. *State v. Peoples*, 227 Kan. 127, 605 P.2d 135 (1980), was an appeal from the conviction for a felony murder wherein the court concluded, 605 P.2d. at 139: "[B]itemark identification by an expert witness is sufficiently reliable and can be a valuable aid to a jury in understanding and interpreting evidence in a criminal case. When the witness has the requisite skill and experience, and demonstrates the accuracy and reliability of his models, photographs, X-rays and supporting exhibits in bite-mark identification, the trial court in the exercise of its power of discretion may properly admit the opinion testimony of the expert witness." *State v. Jones*, 259 S.E.2d 120 (S.C.1979) was a case which involved a conviction for kidnapping, rape, armed robbery and assault. The

court affirmed the conviction and declared that the trial court did not abuse its discretion in admitting techniques and theories of bite mark evidence where there was no showing that such techniques and theories were other than those accepted by photographic and dental communities.

*Doyle v. State*, 159 Tex.Cr.R. 310, 263 S.W.2d 779 (1954) was a case wherein the court affirmed a conviction for burglary and held that in requiring the accused to bite into cheese for bite mark comparison, did not constitute a confession, and evidence of bite mark comparison was held admissible. *Patterson v. State*, 509 S.W.2d 857 (Tex.Cr.App.1974) affirmed a conviction for murder (with dissent) wherein the court concluded that the admission of bite mark evidence was not violative of the 4th and 14th amendment to the Federal Constitution and that such evidence was reliable to permit its admission, citing *Doyle v. State, supra*. *State v. Howe*, 136 Vt. 53, 386 A.2d 1125 (1978) affirmed a conviction for murder where the court held the testimony to be admissible of an expert odontologist regarding comparison of a model of defendant's dentition with photographs of bite marks on the body of the victim notwithstanding the claim by the accused that the state had failed to establish that the metric scale used in enlargement to life size of photograph of victim's lacerated breast exactly matched the actual metric scale which appeared in the photograph itself. The case of *State v. Rough*, 30 Or.App. 901, 568 P.2d 704 (1977), affirmed a conviction for rape where the court ruled that the trial court did not abuse its discretion in admitting testimony of a dentist as to the similarity of bite marks on the victim's neck and one of defendant's teeth.

In our own courts, the determination of admissibility of expert testimony vests largely in the discretion of the trial court, and the exercise of that discretion will not be disturbed on appeal unless an abuse of such discretion is shown, see *State v. Arnold*, 574 S.W.2d 1, 3 (Mo.App.1978), citing *State v. Cook*, 557 S.W.2d 484 (Mo. App.1977). See also *State v. Carter*, 591 S.W.2d 219 (Mo.App.1979).

Our courts follow the rule in *Frye v. United States, supra,* see *State v. Stout,* 478 S.W.2d 368, 369 (Mo.1972), wherein our State Supreme Court applied such rule in denying the admission of a neutron activation analysis of blood as evidence for purposes of the identification of blood samples. At this juncture, one additional authoritative text quotation finds application to the instant case:

"In summary, bite mark comparison results may represent varying degrees of incriminating evidence which must be so designated by the dental expert so that the court or jury can apply the weight of the evidence in proper perspective to the total circumstances surrounding the trial. The defense counsel may attempt to totally exclude the admission of bite mark evidence on the basis of its credibility. Such action merely eliminates a valuable segment of evidence offered to arrive at the truth. The methods of bite mark comparison are based on scientific principles as advanced as the current state of the art. Such evidence should not be suppressed if one wishes to pursue the totality that can be afforded by medicolegal evidence in search of truth." [16]

▬ In summary then, as regards appellant's point two, the court has painstakingly plowed through the record herein and through voluminous legal and dental authorities as well to arrive at the following conclusion. Such emphasis and approach was undertaken because the issue of admissibility of bite mark evidence presents itself for the first time of record in our state. Based upon consideration of all the foregoing factors, question No. 1 above is answered affirmatively.

Returning specifically to appellant's point two, it is found herein, based upon the evidence, that authority from other jurisdictions and from supplemental text and research materials, that the science of positive bite mark identification has reached the level of scientific reliability and credibility to permit its admission as evidence in criminal proceedings.

In addition, the evidence herein clearly establishes that the witnesses who testified for both parties were, in fact, sufficiently qualified as experts to offer and state their opinions upon the issue of identity of the perpetrator of the bite mark on the victim's body. Further, it is found that the factual basis upon which the expert opinions were rendered herein was supported by reliable and credible evidence.

▬ There was no error by the trial court in the admission of such scientific and expert evidence. The weight and sufficiency was for the jury to determine.

For the foregoing reasons, point two, in its entirety, is ruled against appellant.

As his third point of alleged error, appellant contends the trial court erred in the submission of instruction No. 8 in that this instruction failed to state, with particularity, the time of death of the victim. This instruction reads: "If you do not find the defendant guilty of capital murder or murder in the first degree or murder in the second degree then you must consider whether he is guilty of manslaughter.

If you find and believe from the evidence, beyond a reasonable doubt that <u>on or about the 2nd day of September, 1977</u> in the County of Platte, State of Missouri, the defendant caused the death of Julie Wittmeyer by stabbing and cutting her.

Then you will find the defendant guilty of manslaughter.

However, if you do not find and believe from the evidence beyond a reasonable doubt each and all of the foregoing then you must find the defendant not guilty of that offense." (MAI–CR 15.18—underlining added by this court).

Appellant's defense was alibi and he argues that upon informing the state that he would rely upon such defense, the state had replied by stating that the death of the victim occurred between 3:30 and 5:00 p. m. on September 2, 1977. With this being the posture of charge and defense, appellant

16. *Forensic Dentistry,* n. 7, *supra.*

argues that it was necessary to submit the time period to the jury to prevent the jury from finding appellant guilty even though death occurred at a time other than the time specified to appellant.

Appellant further argues the record is void of evidence to support any finding of death between the hours of 3:30 p. m. and 5:00 p. m., therefore, it must follow that no evidence existed to warrant a finding of guilty under an appropriate instruction.

Cited for the court by appellant are cases which have established that time may be of importance when alibi defenses are relied upon. See *State v. Tettamble*, 394 S.W.2d 375, 379 (Mo.1965), vacated and remanded on other grounds, 386 U.S. 265, 87 S.Ct. 1034, 18 L.Ed.2d 42 (1967), on remand, 431 S.W.2d 441 (Mo.1968), appeal after remand, 450 S.W.2d 191 (Mo.1970), where the court held as a rule that ". . . time is not of the essence of the offense of homicide." Therefore, a specific time need not be included in jury instructions. However, as noted by appellant, instructions may be required to include a finding as to the time of the act causing death. This requirement may arise because "time may be of 'decisive importance' even though not of the 'essence' of the offense" when evidence of an alibi is introduced, see *State v. Clark*, 509 S.W.2d 740, 743 (Mo.App.1974). See also *State v. Siems*, 535 S.W.2d 261, 266 (Mo. App.1976) and Paragraph 4, "Notes on Use", MAI–CR 15.00.

Appellant argues for the exception made in cases, where alibi defenses are introduced. Appellant cites *State v. Siems*, supra, at 266:

"Except where time is of the essence, it is not error to give an instruction that submits the happening of the offense at anytime within the limitation period. . . . (citations omitted) Time is not of the essence in a crime of the nature here considered. However, the State has the burden of proof to establish the presence of the accused at the time and place of the offense. Therefore, when an alibi defense is interposed, time may be of decisive importance even though not of the essence of the offense . . . . (citations omitted) With the foregoing principles in mind, we find that the instruction given was not error. When a specific date is presented as the date of the alleged crime, an instruction covering a broad period of time may not be given which would nullify an alibi defense supported by substantial evidence."

Those cases which have required a more specific time period to protect the use of an alibi defense "announce a rule of fundamental fairness that when an alibi is interposed, the time span within which the crime is alleged to have occurred must not be such as to place an impossible burden on the defendant to offer evidence of his whereabouts over an extended period of time," see *State v. Clark*, supra, at 743. In *State v. Clark*, supra, the accused was charged with sodomy. The information specified a certain day and the instruction specified the same day for and as the date of the offense. The accused argued that unless the time be stated with particularity, he would not be able to meet the charges with a defense of alibi. The court concluded that the information was sufficient, reasoning that the accused was made aware of the date. The state had gone one step further and notified the accused that proof would be limited to 3:00 p. m. to "suppertime". The court concluded that the accused did have sufficient notice to prepare his defense of alibi. The court reasoned further that instructions need not allege the precise time of the offense since the instructions required a finding that the offense occurred on that particular day.

In *State v. Siems*, supra, the court upheld an instruction which only specified the offense occurred "during the month of February". The victim could not remember precisely when the offense occurred, but the court reasoned that the instruction sufficiently limited the time of the offense to the facts testified to by the victim.

The instant case, as in *State v. Clark*, supra, shows appellant was charged with having committed the offense on or about (September 2, 1977) a specified date, appel-

lant herein was aware prior to trial that the evidence would focus on the time of 3:30 p. m. to 5:00 p. m. and appellant was given ample opportunity to prepare his alibi defense. The evidence herein showed that the victim had been seen alive at approximately 3:20 p. m. on September 2, 1977. According to the pathologist, death could have occurred between 24 and 72 hours preceding the autopsy performed at 1:30 p. m. on September 4, 1977. Therefore, contrary to appellant's contention, the evidence does support a finding that death occurred between 3:30 p. m. and 5:00 p. m. on September 2, 1977. Additional evidence dispels appellant's contention. Witnesses testified to having seen a car similar to that owned by appellant on HH Highway and Interurban Road around 3:30 to 3:45 p. m. on September 2, 1977. Road tests were presented, which showed that the crime could have been committed during the time appellant left his job until his arrival at his home. It was further argued that when appellant's friends arrived at appellant's home, the hood of appellant's car was still hot as if the motor had just been turned off.

In his alibi defense, appellant described his route home from work. He stated he arrived home around 4:00 p. m.

The evidence before this jury clearly contrasted the time of the offense and the alibi defense of appellant. This is not a case where the jury could believe the appellant was where his alibi defense and corroborating witnesses placed him and still believe the appellant committed the crime. As a result of this contrast in the evidence, Instruction No. 8 did not nullify appellant's alibi defense, see *State v. Graves*, 588 S.W.2d 495 (Mo.banc 1979).

The state channeled its proof to events between 3:30 and 5:00 p. m. Appellant produced his own statement, along with testimony from supporting witnesses, thus developing his whereabouts from 3:30 to 6:00 p. m. The weight and sufficiency of the evidence upon this question was for the trier of fact. The instruction, however,

contrary to appellant's contention, was sufficiently precise to allow appellant to avail himself of an alibi defense. The questioned instruction neither nullified the alibi defense nor placed an impossible burden upon appellant to offer evidence of his alibi defense.

For the foregoing reasons, point three is ruled against appellant.

Appellant, for his alleged error (point four), declares the trial court erred as a matter of law in giving Instruction No. 8 [17] because there was no evidence to support such instruction and no credible evidence existed to support a finding of the crime of manslaughter.

Instruction No. 8 is in absolute conformity to MAI–CR 15.18 and the giving of same was mandatory upon the trial court, see Paragraph (2), Notes on Use, MAI–CR 15.-18; *State v. Stapleton*, 518 S.W.2d 292 (Mo. banc 1975); *State v. King*, 577 S.W.2d 621, 623 (Mo.banc 1979) (reaffirming *State v. Stapleton, supra*).

This court is bound to follow the mandate of our State Supreme Court under the *State v. King, supra*, decision. See also *Stephens v. State*, 583 S.W.2d 282 (Mo.App.1979); *State v. Hegwood*, 558 S.W.2d 378 (Mo.App. 1977) and Mo.Const. Art. V, § 2.

Appellant concedes the mandatory requirement of MAI–CR 15.18 but argues that the instant case was at all times tried and defended upon the theory of capital murder, and no defense or evidence was offered as to mitigate the offense or the charges. Appellant argues that under *State v. Ryan*, 492 S.W.2d 116 (Mo.App. 1973) with manslaughter being a residual offense to murder, a conviction for manslaughter absent any evidence to support such lesser conviction cannot stand. This court does not find *State v. Ryan, supra*, controlling because in that case the accused, under the evidence, was entitled to an instruction on manslaughter.

Appellant further contends that the evidence herein supported only a conviction for

17. *The precise wording of Instruction No. 8 has been set forth earlier in this opinion.*

the higher offense of murder and hence, since he was convicted of manslaughter, his conviction cannot stand.

Appellant raises the question of the sufficiency of the evidence on this point. Under *State v. Ellinger*, 549 S.W.2d 136 (Mo.App. 1977), such attack is to be treated as a motion for judgment of acquittal at the close of all the evidence.

In the instant case, appellant filed an after-trial motion for judgment of acquittal notwithstanding the verdict which was overruled.

The evidence contained in this record is sufficient to warrant a finding that appellant caused the death of the victim by stabbing and cutting her pursuant to Instruction No. 8 set forth above.

■ Appellant seems to argue that since the evidence was so abundant that the jury could have found appellant guilty of capital murder, it was bound only to reach that form of conviction and none other. It should be pointed out that the evidence was sufficient to sustain a conviction for capital murder, but it is also correct that the evidence was sufficient to sustain a conviction for manslaughter, and the jury was not bound to make a finding upon capital murder exclusively, see *State v. King, supra.*

The trial court properly instructed the jury pursuant to MAI–CR 15.18 and this court is bound by the authority interpreting the giving of such an instruction as a required instruction.

Point four is ruled against appellant.

■ For his final alleged error, appellant attempts to preserve every point in his motion for new trial. In this court's attempt to decipher precisely what it is appellant alleges as error, said alleged error is reduced to only one discernible issue. Appellant alleges the trial court erred as a matter of law in its failure to grant appellant a new trial. The reason given is the failure of the prosecutor to timely disclose fully the evidence that was ordered disclosed by the trial court. Such failure is alleged to have been prejudicial. This describes one contention under this alleged error.

The remainder of the final point of error is the attempted generalized preservation of all the points of error assigned in appellant's motion for new trial. Such generalization contends a violation of state and federal constitutional guarantees.

Turning first to the latter portion of appellant's contention, it is found to be without merit upon his failure to properly preserve any point or points for review, plus the complete absence of any argument in support of such allegation.

■ On appeal, the reviewing court does not review points raised in a motion for new trial, which are neither briefed or argued. When an appellant fails to brief or argue any such point, such point is deemed to be waived, see *State v. Heitman*, 473 S.W.2d 722 (Mo.1971); *State v. Sykes*, 436 S.W.2d 32 (Mo.1969) and *State v. Brown*, 527 S.W.2d 15 (Mo.App.1975), reversed on other grounds, 549 S.W.2d 336 (Mo.banc 1977). See also Rule 28.02.

As a final note on this segment of appellant's final alleged error, since appellant expressed some apprehension over the length of his brief (113 pages), this court nonetheless reviewed the transcript relative to these broad assertions and finds they are without merit.

Returning to the remaining segment of appellant's final alleged error, this court finds that appellant on his motion for new trial, and now on appeal, alleges deliberate refusal and failure by the state to comply with the rules of discovery. It is specifically argued that the prosecution failed to obey the trial court order for discovery under date of December 16, 1977 and again at subsequent court appearances. The item serving as the subject of this contention is a report, dated October 13, 1977, from the state's witness Dr. Lester Luntz. This report, set forth below, of course relates directly to the identification of appellant as the perpetrator of the bite mark. The report, which is in the form of a letter, reads as follows:

"Dear Sheriff Thomas:

Enclosed are two copies of my initial dental report on the bite mark photographs and the models. With twenty one points of comparison I am of the professional opinion, with reasonable medical certainty, that the teeth of Mark Sager made the bite mark on the right breast of Julie Whittmeyer [sic]. I will continue to do more research on this case.

Sincerely,

/s/ Lester L. Luntz D.D.S."

In the discovery phase of this trial, appellant deposed Dr. Luntz and in that deposition, appellant argues, Dr. Luntz made the following contradiction: "There are no discrepancies in the photograph of the bitemark and the dentition of Mark Sager to exclude him as the perpetrator of the bitemark."

In the first instance, this court finds difficulty in agreeing with appellant's contention that the context of the letter and the testimony of Dr. Luntz in his deposition are contradictory. Be that as it may, the real issue is whether the record in this case supports appellant's contention that the prosecutor failed or refused to comply with the order of the trial court as to discovery.

Additionally, appellant contends that the prosecution refused to comply with the discovery order in withholding dentitions taken from appellant on September 16 and September 30, 1977.

Referring first to the Luntz report, the record herein fails to support appellant's claim of the prosecution's refusal to comply with the court's order for discovery. It must be remembered that appellant deposed Dr. Luntz (this deposition was never part of the court record). Furthermore, the record herein reflects the report, of which appellant complains, was in fact first alluded to upon cross-examination of Dr. Luntz by appellant. There is nothing in the record of this case which permits this court to determine what conclusions were or might have been drawn by Dr. Luntz in his deposition. On the other hand, the record clearly shows appellant was aware of the report and, in fact, made use thereof by way of cross-examination of Dr. Luntz. The prosecution never offered this report and the record reveals, from whatever source, appellant was fully aware of its existence and content prior to trial.

This court cannot assume facts or evidence not found upon the record, and it cannot assume facts presented as mere allegations on appeal, see *State v. Hatten*, 561 S.W.2d 706 (Mo.App.1978) and *State v. Collett*, 526 S.W.2d 920 (Mo.App.1975).

Appellant's contention concerning the report of Dr. Luntz, and the alleged refusal or failure of the prosecution to comply with the trial court's order for discovery regarding this report, has no evidentiary support upon this record and is found to be without merit. This record reflects no objection by appellant on the ground of surprise or failure to comply with discovery. Appellant challenged the testimony of Dr. Luntz on improper chain of custody, the background of Dr. Luntz and his qualifications, and the lack of scientific acceptance of such testimony. Concerning appellant's contention that the prosecution refused or failed to comply with the trial court's order for discovery regarding appellant's dentitions of September 16, 1977 and September 30, 1977, the record is devoid of any objection by appellant at trial that the prosecution failed to make available the dentitions and that the prosecution failed to comply with the order for discovery.

Of particular interest on this point is the position of appellant following the motion to suppress. The record reveals concern over the voluntariness of appellant in permitting the dentitions to be made and the questioning of such evidence being scientifically reliable. Prior to trial, appellant was apprised of the two dentitions. No objection was made to the introduction of the dentitions upon trial and upon allegations of refusal or failure to comply with the court's order for discovery. Objection was directed to the chain of custody and nothing further. The record further reveals that three of these dentitions were, in fact, never used by the expert witness and hence, were not permitted as evidence by the trial

court. The record reveals that appellant's expert witness has access to the photographs and dentitions prior to trial.

In addition, the record fails to reflect any effort by appellant to secure sanctions by the trial court for failure or refusal to comply with the court's discovery order. Rule 25.45 empowers the trial court to employ a variety of ways to enforce its discovery orders, and the imposition of such sanctions is within the trial court's discretion after the court determines sanctions are warranted, see *State v. Couch*, 569 S.W.2d 789 (Mo. App.1978). Also see *State v. Crow*, 486 S.W.2d 248 (Mo.1972) for the rule that no error lies for failure of the trial court to not rule on anything not brought to its attention. There is nothing incumbent upon a trial court on its own motion to enforce its order for discovery. The parties are left to their option under the rule to seek the aid of the trial court to force the aggrieving party to comply. This record is devoid of any objection to the particular evidence upon failure or refusal to comply with the order for discovery and moreover, the record is totally silent on the matter of appellant, that is, the fact of whether or not he felt threatened, surprised or prejudiced in any manner to seek the assistance of the trial court in enforcing its order of discovery. This trial, including the numerous pretrial motions, proceeded to its end and afterwards, appellant alleges failure or refusal to comply with the discovery order. There is no evidence to support appellant's contention.

▮ This court is not unmindful of its inherent power to review this point pursuant to Rule 27.20 for plain error. A determination of plain error is predicated upon manifest injustice or a miscarriage of justice, resulting in prejudice to an accused. Consideration of the entire proceedings upon this record leads to the conclusion that no plain error arose in this case.

Appellant, from the outset, was ably presented by counsel. A vigorous, constant assault upon the evidence commenced at appellant's motion to suppress and continued throughout the trial. Appellant was, throughout these proceedings, apprised of the prosecution's evidence to the point that such claimed evidence directly reflected upon the guilt of appellant.

There is no evidence which shows appellant was ever misled or surprised during this trial which in any manner led to the prejudice of the rights of appellant.

Point five for the foregoing reasons is ruled against appellant.

The length of this opinion reflects the extensiveness of the record herein, inclusive of the multitude of exhibits. More importantly, it is hoped the length and breadth of this opinion reflects the importance of the issue, not only of the trial of this appellant, but the issue of bite mark identification as a means of evidence in criminal proceedings.

Appellant was charged with capital murder. He was ably represented by counsel, who presented a vigorous defense on his (appellant's) behalf at every step in the proceedings. The trial court was attentive to all segments of the trial proceedings, especially as to the introduction of evidence. The rulings made thereon were proper. A jury of appellant's peers found appellant guilty of manslaughter. It was left to the trier of fact to weigh the evidence and determine the credibility of the evidence and the witnesses upon trial in arriving at the verdict.

This court finds no error in the trial of this case and for the foregoing reasons, Points I, II, III, IV and V alleged as error are ruled against appellant. The judgment herein is in all respects affirmed.

All concur.

## APPENDIX A

1) W. Harvey, *Dental Identification and Forensic Odontology* (1976)

2) *The Criminologist* (N. Morland ed. 1971)

3) C. Hirsch, R. Morris & A. Moritz, *Handbook of Legal Medicine* (5th ed. 1979)

4) *Legal Medicine Annual 1978* (C. Wecht ed. 1979)

5) L. Siegal, *Forensic Medicine* (1963)

6) *Gradwohl's Legal Medicine* (2d ed. F. Camps 1968)

7) I. Sopher, *Forensic Dentistry* (1976)

8) L. Luntz, *Handbook for Dental Identification* (1973)

9) Cameron & Sims, *Forensic Dentistry* (1973)

10) Gladfelter, *Dental Evidence: A Handbook for Police* (1975)

11) Beckstead, Rawson & Giles, *Review of Bite Mark Evidence*, 99 JADA 69–74 (1979)

12) Horne, *A Case of Bite Marks*, 4 *Chronicle, Omaha District Dental Society* 72 (1977)

13) Mertz, *Forensic Dentistry Today*, 71 CDS Review 21–24 (1973)

14) *Legal Medicine Annual* 1970 (C. Wecht Ed. 1971)

15) Hanley, *Some Aspects of Forensic Dentistry*, 70 *Proc. Roy. Soc. Med.* 263,264 (1977)

16) Levine, *Dentistry, An Emerging Forensic Science*, 72 *New York State Journal of Medicine* 820–822 (1972)

17) Luntz & Luntz, *A Case in Forensic Odontology: A Bite-Mark in a Multiple Homicide*, 36 *Oral Surgery* 72–78 (1973)

18) Goodbody, Turner & Turner, *The Differentiation of Toothed Marks: Report of a Case of Special Forensic Interest*, 16 *Med. Sci. Law* 44–48 (1976)

19) Vale, Sognnaes, Felando & Noguchi, *Unusual Three-Dimensional Bite Mark Evidence in a Homicide Case*, 21 *Journal of Forensic Sciences* 642–652 (1975)

20) Woolridge, *Legal Problems of the Forensic Odontologist*, 18 *Journal of Forensic Sciences* 40–46 (1972)

21) Dinkel, *The Use of Bite Mark Evidence as an Investigative Aid*, 19 *Journal of Forensic Sciences* 535–547 (1973)

22) Stoddart, *Bite Marks in Perishable Substances*, 135 *British Dental Journal*, 285–287 (1973)

23) Bang, *Analysis of Tooth Marks in a Homicide Case*, 34 *Acta Odontologica Scandinavica* 1–11 (1976)

24) W. Curran, A. McGarry & C. Petty, *Modern Legal Medicine, Psychiatry, and Forensic Science* (1980)

25) L. Adelson, J. Faust, C. Hirsch, O. Schroeder & D. Scott, *Medicine, Dentistry and Law, A Partnership for Criminal Justice: Identification of the Murder Victim* (1977)

26) Hale, *The Admissibility of Bite Mark Evidence*, 51 *Southern Cal.Law Review* 309–334 (1978)

27) Whittaker, *Some Laboratory Studies on the Accuracy of Bite Mark Comparison*, 25 *International Dental Journal*, 166–171 (1975)

28) Levine, *Bite Mark Evidence*, 21 *Dental Clinics of North America*, 145–158 (1977)

29) Barbenel & Evans, *Bite Marks in Skin—Mechanical Factors*, 14 *Journal of Forensic Science* 235–237 (1974)

30) MacDonald, *Bite Mark Recognition and Interpretation*, 14 *Journal of Forensic Science* 229–233 (1974)

31) Levine, *Forensic Odontology—Identification by Dental Means*, 22 *Australian Dental Journal* 481–487 (1977)

32) MacDonald & MacFarlane, *Forensic Odontology*, 3 *Glasgow Dental Journal* 16–19 (1972)

33) Sognnaes, *Forensic Oral Measurements*, *Dental Survey* 12–24 (1978)

34) Luntz & Luntz, *Landmark Decision Involving a Bite Mark*, 2 *Dental Dimensions*, 7–9 (1978)

35) *Standardization of Bite Mark Evidence*, a report by Sgt. Robert Wilson, Laboratory Supervisor, Dupage County Sheriff's Department, Wheaton, Illinois

## APPENDIX B

1) Stephen C. Warlen: Training at the Kansas City Police Department in checking physical evidence; one forty-hour course in evidence technology; two hundred hours at FBI Academy in police lab photography and latent print photography.

■■■■■■■■■■■■■

2) Dr. Jon Finley: Graduate of University of Illinois Dental School in 1967; interned in the U.S. Public Health Service in Stanton Island; Staff dentist for Public Health Service for two years; resident at Veterans Administration Hospital in Leavenworth and University of Missouri in prosthodontics for two years; currently teaches fixed prosthodontics at the University of Missouri, Kansas City, to undergraduate and graduate students; currently gives postgraduate courses to other dentists; engaged in private practice.

3) Dr. Lester. Luntz: Graduate of the University of Pennsylvania School of Medicine in Philadelphia, Pennsylvania; postgraduate training courses nearly every year since 1949, many of which have been on forensic dentistry; engaged in private practice as well as forensic dentistry—lectures in forensic dentistry at Connecticut State Police Training Academy; member of Hartford Dental Society, Connecticut State Dental Association, American Dental Association, American Academy of Forensic Sciences, Forensic Science Society of London, International Society for Forensic Odonto-Stomatology, as well as other professional organizations; recipient of various dental and forensic odontology-related awards; author of a great many journal articles as well as one book on forensic odontology, *Handbook for Dental Identification.*

4) Dr. John Furness: Graduate of the University of Durham, qualified as a licentiate in dental surgery; engaged in private practice with a specialty of 19 years in forensic odontology; currently consultant dental surgeon in forensic odontology to the Home Office Northwestern Forensic Science Laboratory in Chorley, Lancashire, consultant dental surgeon to Police Region 1 covering England and Wales; lecturer in forensic odontology to the University of Liverpool; member of British Academy of Forensic Sciences, Forensic Science Society, Odontological Society, British Dental Association, and a host of other professional organizations; licensed to practice dental surgery in England, Scotland, Wales and Ireland; author of many articles on various topics, including forensic odontology and bite marks; lecturer at many universities on bite marks and forensic odontology.

5) Roger Summers: Five years expert police photographer at New Scotland Yard, London; ten-week training school as Senior Scenes of Crime Officer with training in police photography, fingerprints, and forensic science; Duke of Edinburgh Gold Medal for photography; member International Fingerprint Society, International Forensic Science Society; lectures before bobbies within police service, and to outside professional bodies and photographic circles and scientific symposiums.

6) Dr. Edwin Everett Andrews: Bachelor of Science Degree from Syracuse University, 1956, Fairleigh Dickinson University Dental School in New Jersey, 1963, Master's Degree in Education in 1976 from Central State University in Oklahoma; currently private practitioner with specialties in prosthodontist and maxillofacial prosthodontist; one year internship at Upstate Medical Center in Syracuse, New York; two year residency in prosthodontics; past associate professor of prosthodontics at the University of Oklahoma College of Dentistry; currently a diplomat of American Board of Prosthodontics, and American Board of Forensic Odontology; consultant to the Office of Chief Medical Examiner for the State of Oklahoma, consultant to Federal Aviation Administration in Oklahoma City for forensic odontology; member of various faculties; holds Oklahoma license to practice dentistry and specialty license in prosthodontics; holds Missouri certificate to practice dentistry; holds New York and New Jersey license to practice dentistry; currently member of American Academy of Forensic Sciences, American Society of Forensic Odontology, and various other organizations; past professor and faculty member at University of Oklahoma College of Dentistry, University of Missouri, Kansas City, State University of New York College of Medicine, Onondaga Community College in Syracuse, New York; has had graduate courses and experience in pathology.